*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| WILLIAMS ALASKA PETROLEUM, INC. and THE WILLIAMS COMPANIES, INC., | ) ) ) ) Supreme Court No. S-17772 |
| | ) ) Superior Court No. 4FA-14-01544 CI |
| Appellants, | ) |
| | ) O P I N I O N |
| v. | ) |
| | ) No. 7658 – May 26, 2023 |
| STATE OF ALASKA; FLINT HILLS RESOURCES, LLC; and FLINT HILLS RESOURCES ALASKA, LLC, | ) ) ) |
| | ) |
| Appellees. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Warren W. Matthews, Judge pro tem.

Appearances: David H. Shoup, Tindall Bennett & Shoup, P.C., Anchorage, and Tristan L. Duncan and Mathew L. Larsen, Shook, Hardy & Bacon L.L.P., Kansas City, Missouri, for Appellants. Laura Fox and Steven E. Mulder, Assistant Attorneys General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee State of Alaska. James N. Leik, Perkins Coie LLP, Anchorage, and Jan M. Conlin and Mathew R. Korte, Ciresi Conlin LLP, Minneapolis, Minnesota, for Appellees Flint Hills Resources, LLC and Flint Hills Resources Alaska, LLC.

Before: Winfree, Chief Justice, Maassen, Carney,

Henderson, Justices, and Eastaugh, Senior Justice.[*] [Borghesan, Justice, not participating.]

CARNEY, Justice.

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       A.    Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       B.    Statutory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
       C.    Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.   STANDARDS OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.    DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
       A.    State's Statutory Claims Against Williams. . . . . . . . . . . . . . . . . . 17
             1.    The superior court did not err when it concluded that sulfolane is a
                   hazardous substance under AS 46.03.826(5). . . . . . . . . . . . . . 17
             2.    The superior court did not err by awarding response costs to the
                   State and Flint Hills. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
             3.    The superior court did not err by awarding damages for loss of
                   access to groundwater due to sulfolane contamination.. . . . . . . 38
             4.    It was error to issue injunctive relief by reference to supporting
                   documents, but the superior court did not err by granting declaratory
                   relief.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
                   a.    Challenges to the injunctive relief. . . . . . . . . . . . . . . . . 50
                   b.    Challenges to the declaratory relief. . . . . . . . . . . . . . . 53
             5.    Williams's right to due process was not violated. . . . . . . . . . . 56
             6.    Imposing civil liability for past releases was not an unconstitutional
                   taking. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
       B.    Flint Hills's Contractual Indemnification And Statutory Contribution
             Claims Against Williams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
             1.    Overview of the Purchase Agreement's indemnification and
                   remedies provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

---

[*]     Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

2. The superior court did not erroneously conclude that the Purchase Agreement limited Flint Hills's liability. . . . . . . . . . . . . . . . . . . 69

3. The superior court did not err by concluding Williams retained responsibility for offsite sulfolane.. . . . . . . . . . . . . . . . . . . . . . . 71

4. The superior court did not err by concluding that Flint Hills could pursue contribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

5. The superior court's contribution allocations were not erroneous. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

    a. The court did not err by allocating statutory contribution for offsite sulfolane to Williams.. . . . . . . . . . . . . . . . . . . . . . . 83

    b. The superior court adequately considered DEC's earlier non-regulation of sulfolane when it allocated damages. . . . . 83

    c. The superior court did not penalize Williams for "defending itself.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

    d. The superior court did not err by not allocating responsibility to the State or by ignoring Williams's equitable defenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    e. The superior court did not err by failing to allocate responsibility to the City of North Pole. . . . . . . . . . . . . . 89

VI. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

## I. INTRODUCTION

Following the release of hazardous substances that contaminated local groundwater, the State and the previous and current owners of a refinery litigated contract and statutory claims for damages, contribution, and injunctive relief under Alaska's environmental conservation statutes. The superior court rejected the previous owner's claims against the State and the current owner, found the previous owner strictly liable, and ordered it to pay damages to the State and make contribution to the current owner for its remediation costs. The court also issued injunctions requiring the previous owner to perform and pay for various ongoing remediation and cleanup efforts. The previous owner appeals many of the superior court's findings of fact and

conclusions of law. The previous owner contends that the superior court erred by concluding the substance at issue was hazardous, awarding response costs to the State and the current owner, awarding damages for loss of groundwater access, issuing improper injunctive and declaratory relief, interpreting the purchase contract between the former and current owners to hold the former owner responsible for the substances released, and improperly allocating damages. The previous owner also contends that the decision violated its right to due process and was an unconstitutional taking. We affirm the superior court's decision except that we remand the grant of injunctive relief for more specificity as required by rule.

## II.     BACKGROUND

### A.     Facts

Williams Alaska Petroleum, Inc. and The Williams Companies, Inc. (collectively Williams) owned and operated a North Pole refinery beginning in 1977. The refinery is on State-owned land which Williams leased. Williams began using sulfolane as a purifying solvent in its refining process in 1985. Sulfolane is highly soluble in water, meaning it can easily seep into groundwater when released onto the ground and into waterways, and it has low volatility, meaning it will not readily evaporate and instead remains in groundwater without attaching to the soil.

Williams allowed sulfolane to migrate into the groundwater at the refinery through various means. Sulfolane was recycled to the extent feasible, but due to its high solubility some remained dissolved in water from refinery processes and was diverted into the wastewater system. Due to poor upkeep — with documented foot-wide tears in wastewater lagoon linings and some holes "repaired" by "pulling [the] liner together and punching with . . . pieces of lumber" — several wastewater storage units leaked sulfolane into the soil and groundwater. There were also direct sulfolane spills. Williams had multiple accidental releases of sulfolane-containing solutions, resulting in the release of

hundreds of gallons of solution with sulfolane concentrations ranging from 66% to 100%.

Sulfolane was detected in groundwater at the refinery in 1996 when Williams's lab manager found sulfolane in groundwater samples in concentrations ranging from 250,000-2,700,000 parts per billion (ppb). Williams did not report its 1996 detection of sulfolane in groundwater to the Alaska Department of Environmental Conservation (DEC) until five years later in October 2001, when Williams's consultant Shannon & Wilson prepared a report for Williams's 2002 Site Characterization and Corrective Action Plan to address earlier environmental concerns about the refinery. By 2001 sulfolane was generally known in the scientific community to "exhibit[] low levels of toxicity," but there otherwise was a dearth of available information about sulfolane, and DEC did not regulate it as a hazardous substance. DEC advised Williams about this uncertainty regarding sulfolane's toxicity and cautioned Williams about sulfolane's high mobility in groundwater. DEC instructed Williams to continue sampling the groundwater until it found the contamination source. DEC informed Williams it could reduce sampling frequency if its data were not changing and it could not find a source. Williams was not able to determine the specific source and stopped sampling altogether in July 2002.

Williams also used aqueous foams as part of its fire response practices. These foams at the time contained per- and polyfluoralkyl substances, commonly called "PFAS."[1] The PFAS in the foams included a wide range of synthetic chemicals; among

---

[1] *See* 4 LAWRENCE G. CETRULO, TOXIC TORTS LITIGATION GUIDE § 48:1 (2022-23 ed.) ("Per- and polyfluoroalkyl substances (PFAS) is a general term used to describe a group of over 5,000 different synthetic chemicals that are used in industrial and commercial applications throughout the world, most commonly to repel water and oil, to combat high temperatures, and to reduce the effects of friction.").

the chemicals were perfluorooctanesulfonic acid (PFOS) and perfluorooctanoic acid (PFOA).[2] Testing of the groundwater and soil at the refinery shows that, at the time of trial, they contained several PFAS, including PFOA and PFOS.

On March 31, 2004 Williams sold the refinery to Flint Hills Resources, LLC and Flint Hills Resources Alaska, LLC (collectively Flint Hills). The parties to the sale signed an Asset Sale and Purchase Agreement they agreed would be governed by Texas law. It contained detailed provisions about the assumption or retention of liabilities related to all aspects of the refinery's operations, including environmental liabilities. The parties agreed to hold harmless and indemnify each other for costs arising from their respective retained liabilities. Williams agreed to retain most environmental liabilities arising from its operations at the refinery, excepting specific matters listed on a Disclosure Schedule.

In an effort to ensure more certainty about future indemnification obligations, the parties included a limit on indemnifiable damages with a specific Environmental Cap of $32 million. They further agreed that for claims "arising out of" the Purchase Agreement, the remedies listed in the Purchase Agreement would be exclusive, with certain exceptions including claims for equitable relief. Williams agreed to purchase a $50 million environmental liability insurance policy and paid $2.4 million in premiums.

The Purchase Agreement also specified that Flint Hills was responsible for future sulfolane releases at the refinery beginning April 1, 2004. DEC informed Flint

---

[2]	Because the ingredients in the foam were proprietary information, the exact compounds contained in the foams were not known at the time. An expert witness testified at trial that, based on safety information provided by the manufacturer, the PFAS presumably included PFOA. Williams admitted the foams contained PFAS and PFOS, but stated it did not know whether they contained PFOA.

Hills in October 2004 that it considered sulfolane a regulated contaminant and would be adopting cleanup standards.

By April 2019 the sulfolane in the groundwater had laterally travelled, creating a plume approximately two miles wide, three and a half miles long, and over three hundred feet deep, and spreading offsite from the refinery. The plume then extended into the City of North Pole's groundwater, and it is expected that sulfolane will continue to flow from the refinery site. Flint Hills and the State have taken a variety of steps to mitigate damages from the groundwater sulfolane plume, including providing alternative interim water, well-testing, community outreach, and drafting site characterization and corrective action plans. The most significant step has been expanding the City's piped water system.

## B.    Statutory Background

The legislature passed the Environmental Conservation Act[3] to "conserve, improve, and protect [Alaska's] natural resources and environment and control . . . pollution, in order to enhance the health, safety, and welfare of the people of the state."[4] The statutes empower a court to issue injunctions and impose damages on violators.[5]

Alaska Statute 46.03.710 prohibits polluting or adding "to the pollution of the air, land, subsurface land, or water of the state."[6] Alaska Statute 46.03.760 authorizes civil damages[7] for violation of the Act or a DEC regulation, order, or permit. The State's

---

[3]    AS 46.03.010-.900.

[4]    AS 46.03.010 (declaring policy).

[5]    AS 46.03.765.

[6]    AS 46.03.710.

[7]    "Damages include but are not limited to injury to or loss of persons or
(continued...)

available damages for a violation of the Act are limited to "$100,000 for the initial violation" and "$5,000 for each day after that on which the violation continues."[8] Subsection .760(a) also provides that the assessments

> shall reflect, when applicable,
>
> (1) reasonable compensation in the nature of liquidated damages for any adverse environmental effects caused by the violation, which shall be determined by the court according to the toxicity, degradability, and dispersal characteristics of the substance discharged, the sensitivity of the receiving environment, and the degree to which the discharge degrades existing environmental quality;
>
> (2) reasonable costs incurred by the state in detection, investigation, and attempted correction of the violation;
>
> (3) the economic savings realized by the person in not complying with the requirement for which a violation is charged.

In addition to the damages allowed by subsection .760(a), subsection .760(d) allows uncapped liability in cases of oil pollution or releases of hazardous substances for actual damages caused to the state by a violation of AS 46.03.740-.750,[9]

---

[7]     (...continued)
property, real or personal, loss of income, loss of the means of producing income, or the loss of an economic benefit." AS 46.03.824.

[8]     AS 46.03.760(a).

[9]     AS 46.03.740 (prohibiting the discharge of "petroleum, acid, coal or oil tar, lampblack, aniline, asphalt, bitumen, or a residuary product of petroleum, into, or upon the waters or land of the state" except as permitted). Alaska Statute 46.03.745 prohibits the uncontrolled release of a "hazardous substance as defined in AS 46.09.900." Alaska Statute 46.09.900(4) defines "hazardous substance" as

> (A) an element or compound that, when it enters into or on

(continued...)

including "(1) direct and indirect costs associated with the abatement, containment, or removal of the pollutant; (2) restoration of the environment to its former state; (3) amounts paid as grants . . . and (4) all incidental administrative costs."[10]  The statute cautions that "actions under this section may not be used for punitive purposes, and sums assessed by the court must be compensatory and remedial in nature."[11]  Section .780 provides that if a violation "causes the death of fish, animals, or vegetation or otherwise injures or degrades the environment of the state," the violator may be additionally liable up to the "amount equal to the sum of money required to . . . replenish a damaged or degraded resource, or to otherwise restore the environment of the state to its condition before the injury."[12]

   To recover uncapped actual damages for a violation under AS 46.03.760(d), the State must bring a civil action under AS 46.03.822, which provides for strict liability for the release of hazardous substances.[13]  Subsection .822(a) holds persons strictly liable

---

[9] (...continued)
the surface or subsurface land or water of the state, presents an imminent and substantial danger to the public health or welfare, or to fish, animals, vegetation, or any part of the natural habitat in which fish, animals, or wildlife may be found; or (B) a substance defined as a hazardous substance under 42 U.S.C. 9601 - 9657 (Comprehensive Environmental Response, Compensation, and Liability Act of 1980) [CERCLA]; "hazardous substance" does not include uncontaminated crude oil or uncontaminated refined oil . . . .

[10] AS 46.03.760(d).

[11] AS 46.03.760(b).

[12] AS 46.03.780.

[13] *See* AS 46.03.760(d) and AS 46.03.822.

if they owned or had control over the hazardous substance at the time of release, or owned or operated the facility where the hazardous substance was released or disposed.[14] For the State to recover damages under subsection .822(a), it must demonstrate that the released substance is a "hazardous substance" as defined by AS 46.03.826(5):

> (A) an element or compound which, when it enters into the atmosphere or in or upon the water or surface or subsurface land of the state, presents an imminent and substantial danger to the public health or welfare, including but not limited to fish, animals, vegetation, or any part of the natural habitat in which they are found;
>
> (B) oil; or
>
> (C) a substance defined as a hazardous substance under 42 U.S.C. 9601(14).[15]

---

[14]    AS 46.03.822(a)(1)-(3).

[15]    42 U.S.C. 9601(14) defines "hazardous substance" under CERCLA as

> (A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 U.S.C. 1321(b)(2)(A)], (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C. 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 U.S.C. 1317(a)], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C. 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 U.S.C. 2606]. The term does not include petroleum,

(continued...)

In addition to allowing the State to recover uncapped actual damages, AS 46.03.822 holds persons "strictly liable, jointly and severally, for damages, for the costs of response, containment, removal, or remedial action incurred by the state, a municipality, or a village, and for the additional costs of a function or service, including administrative expenses for the incremental costs of providing the function or service."[16]

The statute explicitly holds ineffective any "indemnification, hold harmless, or similar agreement . . . to transfer liability . . . from the owner or operator of a facility."[17]  However, the statute allows for indemnification and hold harmless agreements between liable parties to shift financial responsibility.[18]  Once liability is determined by the court, parties "may seek contribution from any other person who is liable under (a) of this section."[19]  To resolve a claim for contribution, "the court may allocate damages and costs among liable parties using equitable factors determined to be appropriate by the court."[20]

## C.    Proceedings

In March 2014 the State sued Williams and Flint Hills seeking declaratory

---

[15]    (...continued)
. . . natural gas, . . . or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

[16]    AS 46.03.822(a). Subsection .822(b) which relieves persons from liability if certain narrow conditions arise, is inapplicable.  *See* AS 46.03.822(b) (releasing liability if the release occurred solely because of an act of war; "an intentional or negligent act or omission of a third party"; or an "act of God").

[17]    AS 46.03.822(g).

[18]    *Id.*

[19]    AS 46.03.822(j).

[20]    *Id.*

relief, injunctive relief, and damages resulting from discharges of oil and sulfolane. The State alleged that sulfolane is a hazardous substance as defined by Alaska's environmental conservation statutes and administrative code. In its answer, Williams denied that its sulfolane releases were unlawful; asserted various legal, equitable, and constitutional defenses; and made counterclaims against the State. Williams claimed the State was a responsible landowner under AS 46.03.822(a) and could not "transfer its liability" to Williams because it had not regulated sulfolane during Williams's tenure at the refinery. Williams also claimed that DEC was ordinarily and grossly negligent in supervising the refinery during Flint Hills's tenure, allowing sulfolane to migrate off the refinery property, which in turn resulted in damages to Williams that it should be able to recover in contribution under AS 46.03.822(j).

Flint Hills similarly denied liability under the Act and asserted legal, equitable, procedural, and constitutional defenses in its answer. Flint Hills claimed the State and Williams were responsible parties under AS 46.03.822(a), and Flint Hills counterclaimed against the State for contribution under AS 46.03.822(j). It also crossclaimed against Williams seeking contribution under AS 46.03.822(j) and indemnification under the terms of the Purchase Agreement, specific performance of the Purchase Agreement, and declaratory judgment regarding Flint Hills's right to contribution and indemnification from Williams. Williams in turn asserted crossclaims against Flint Hills, claiming that Flint Hills had breached the Purchase Agreement, was unjustly enriched by improperly seeking coverage from Williams's environmental insurance policy, and was ordinarily and grossly negligent in allowing sulfolane contamination. Williams sought damages for breach of contract, declaratory judgment that it was entitled to indemnification under the Purchase Agreement, contribution under AS 46.03.822(j), and application of the Purchase Agreement's Environmental Cap to any potential liability against Williams.

The City of North Pole also filed suit that year. Its case and a case brought by a North Pole resident against Williams and Flint Hills in 2010 were consolidated with the State's suit. After PFAS contamination was discovered at the site, the State and Flint Hills filed additional claims against Williams.

In 2016 we ruled in *Flint Hills Resources Alaska, LLC v. Williams Alaska Petroleum, Inc.* (*Flint Hills I*) that Flint Hills's claims against Williams for contractual indemnification and statutory contribution under AS 46.03.822(j) were time-barred with respect to onsite sulfolane contamination, but not offsite sulfolane contamination.[21] We also determined that because Flint Hills's claims against Williams for declaratory and injunctive relief were "equitable remedies . . . identical to the legal remedies Flint Hills sought in its statutory and contractual claims,"[22] it had not been error for the superior court to dismiss the equitable claims.[23]

In February 2017 Flint Hills reached a settlement with the State and the City, agreeing to partially fund an extension of piped water to affected residents. The superior court accordingly dismissed with prejudice the State's and Flint Hills's claims against each other.

The State and Flint Hills added claims against Williams for offsite PFAS soon after it was discovered in late 2018, but because discovery deadlines had passed the

---

[21]    377 P.3d 959, 973 (Alaska 2016).

[22]    *Id.* at 974 ("Flint Hills sought a judgment from the court declaring that Williams must indemnify Flint Hills under the [Purchase] Agreement and that Williams 'is obligated to contribute to Flint Hills all [s]tatutory [d]amages that have resulted . . . from the [c]ontamination.' Flint Hills also sought an order requiring Williams to perform under the terms of the [Purchase] Agreement." (lowercase alterations in original)).

[23]    *See Knaebel v. Heiner*, 663 P.2d 551, 553 (Alaska 1983) ("One who seeks the interposition of equity must generally show that he either has no remedy at law or that no legal remedy is adequate.").

parties agreed the court would refer the offsite PFAS claims to DEC under the doctrine of primary jurisdiction.[24] Williams moved to defer onsite PFAS issues to DEC under the same doctrine, but the superior court denied the motion, finding it was "primarily made for purposes of delay" and would not facilitate the "orderly and reasonable coordination of the work of agencies and courts" after "five years of active litigation."

In June 2019 the superior court deconsolidated the State's and the City's cases against Williams.

The State's case against Williams proceeded to a bench trial. Over 16 days each side called lay and expert witnesses and admitted thousands of pages of exhibits into evidence.[25] The court issued a lengthy memorandum decision and final judgment, concluding that sulfolane is a hazardous substance and that Williams is strictly, jointly, and severally liable for its sulfolane release as well as for onsite PFAS and oil releases. The court allocated 75% responsibility for offsite sulfolane costs to Williams and ordered it to pay damages for that portion of the State's response and oversight costs, as well as for natural resource damages caused by the loss of the public's access to groundwater due to sulfolane contamination. The court held Williams responsible for 75% of future State costs related to the piped water system and held further that the State could recover from Williams that portion of "DEC's future oversight costs." The court additionally ordered Williams to abide by Alaska statutes and DEC regulations related to monitoring, reporting, and cleanup of offsite sulfolane and onsite PFAS. The court found that Flint

---

[24] "Primary jurisdiction is a judicially created prudential doctrine that applies 'to claims properly cognizable in court [but] that contain some issue within the special competence of an administrative agency.' " *Seybert v. Alsworth*, 367 P.3d 32, 39 (Alaska 2016) (alteration in original) (quoting *Reiter v. Cooper*, 507 U.S. 258, 268 (1993)).

[25] We discuss the relevant aspects of testimony and evidence presented when addressing each point on appeal.

Hills was not responsible for PFAS contamination at the refinery.

The superior court then turned to Flint Hills's claims against Williams to recover costs for responding to the contamination. The court determined that Williams had retained liability for offsite sulfolane existing on the date Flint Hills acquired the refinery. The court found that, although Flint Hills could not recover its costs for responding to the contamination through the Purchase Agreement's indemnification provisions, Flint Hills could obtain statutory contribution under AS 46.03.822(j). The court granted Flint Hills recovery from Williams for its equitable share of past offsite sulfolane response costs, as well as its share of future costs related to the piped water system and other offsite sulfolane remediation costs. The court also ordered Williams to indemnify, defend, hold harmless, and reimburse Flint Hills for all onsite PFAS-related future claims and costs. And the superior court dismissed all of Williams's claims against the State and Flint Hills.

Williams appeals, claiming the superior court erred on various points of fact and law.

## III.  STANDARDS OF REVIEW

We review the superior court's factual findings for clear error.[26] "Clear error exists 'when "after a thorough review of the record, we come to a definite and firm conviction that a mistake has been made." ' "[27] Questions of law, which include whether the superior court applied the correct legal standard, are reviewed de novo.[28]

"We review a superior court's evidentiary rulings for abuse of discretion,"

---

[26]     *Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 392 (Alaska 2017).

[27]     *Id.* (quoting *Laybourn v. City of Wasilla*, 362 P.3d 447, 453 (Alaska 2015) (quoting *3-D & Co. v. Tew's Excavating, Inc.*, 258 P.3d 819, 824 (Alaska 2011))).

[28]     *Janes v. Alaska Railbelt Marine, LLC*, 309 P.3d 867, 875 (Alaska 2013).

reversing only "evidentiary rulings that are both erroneous and prejudicial."[29] Under this standard, we ask "whether the reasons for the exercise of discretion are clearly untenable or unreasonable."[30] We also apply the abuse of discretion standard when we review grants or denials of injunctive relief[31] and decisions to "stay or dismiss a claim" under the primary jurisdiction doctrine.[32]

"The superior court's decision to allocate and apply contribution to a damage award involves the interpretation and application of a statute."[33] We apply our independent judgment to questions of law, including "the interpretation and application of a statute," as well as "[w]hether the superior court applied an incorrect legal standard."[34] "We interpret statutes 'according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters.' "[35]

---

[29]     *Id.*

[30]     *Burke v. Maka*, 296 P.3d 976, 979-80 (Alaska 2013).

[31]     *Lee v. Konrad*, 337 P.3d 510, 517-18 (Alaska 2014); *see also State v. Galvin*, 491 P.3d 325, 332 (Alaska 2021) (explaining that reviewing an order for injunctive relief often also involves reviewing conclusions of law and findings of fact).

[32]     *Seybert v. Alsworth*, 367 P.3d 32, 36 (Alaska 2016); *see also Matanuska Elec. Ass'n v. Chugach Elec. Ass'n*, 99 P.3d 553, 559 (Alaska 2004) (recognizing that "primary agency jurisdiction doctrine is one of prudence, and not an absolute jurisdictional limitation").

[33]     *Oakly Enters., LLC v. NPI, LLC*, 354 P.3d 1073, 1078 (Alaska 2015); *see* AS 46.03.822(j).

[34]     *Oakly Enters., LLC*, 354 P.3d at 1078 (quoting *Guttchen v. Gabriel*, 49 P.3d 223, 225 (Alaska 2002)).

[35]     *Id.* (quoting *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

"The constitutionality of a statute and matters of constitutional or statutory interpretation are questions of law to which we apply our independent judgment, adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[36]

"Questions of contract interpretation are generally questions of law which we review de novo; but fact questions are created when the meaning of contract language is dependent on conflicting extrinsic evidence."[37] "Where the superior court considers extrinsic evidence in interpreting contract terms, . . . we will review the superior court's factual determinations for clear error and inferences drawn from that extrinsic evidence for support by substantial evidence."[38]

## IV. DISCUSSION

### A. State's Statutory Claims Against Williams

#### 1. The superior court did not err when it concluded that sulfolane is a hazardous substance under AS 46.03.826(5).

To impose strict liability on Williams under AS 46.03.822(a) for damages caused by sulfolane releases, the superior court first needed to determine whether sulfolane is a hazardous substance.[39] It concluded that the sulfolane released by Williams

---

[36] *Dep't of Revenue v. Nabors Int'l Fin., Inc.*, 514 P.3d 893, 898 (Alaska 2022) (quoting *Premera Blue Cross v. State, Dep't of Com., Cmty. & Econ. Dev., Div. of Ins.*, 171 P.3d 1110, 1115 (Alaska 2007)).

[37] *Afognak Joint Venture v. Old Harbor Native Corp.*, 151 P.3d 451, 456 (Alaska 2007).

[38] *Nautilus Marine Enters., Inc. v. Exxon Mobil Corp.*, 305 P.3d 309, 315 (Alaska 2013) (quoting *Villars v. Villars*, 277 P.3d 763, 768 (Alaska 2012)).

[39] *See* AS 46.03.822(a) (describing extent to which persons are liable for costs associated with unpermitted release of hazardous substances); AS 46.03.826(5) (defining (continued...)

satisfied all three statutory definitions of hazardous substance under AS 46.03.826(5).[40] Williams argues that the superior court misinterpreted the law when it found that sulfolane met any of the three statutory definitions of hazardous substance. We disagree, and affirm the superior court's determination that sulfolane is a hazardous substance under the Act.

Several weeks before trial, the superior court issued a memorandum tentatively adopting interpretations of "hazardous substance" used in AS 46.03.822(a) and defined in subsection .826(5)(A). It later adopted those interpretations in its decision. The court construed "imminent and substantial danger to the public health" to mean "a reasonable medical concern about the public health where, given the modifier 'substantial,' the nature of the harm giving rise to concern is serious and, given the modifier 'imminent,' the threat of harm must be present, although the potential impacts may never develop or may take time to develop." The court primarily drew from several federal circuit court decisions interpreting federal statutes with "imminent danger" requirements to cover "potential" harms,[41] as well as our decisions broadly interpreting

---

[39]  (...continued)
"hazardous substance").

[40]  *See* AS 46.03.826(5) (defining hazardous substance as (A) a substance which poses imminent and substantial danger to public health or welfare or natural environment when released, (B) oil, or (C) a substance defined in CERCLA's definitions section at 42 U.S.C. 9601(14)).

[41]  *See Reserve Mining Co. v. EPA*, 514 F.2d 492, 528-29 (8th Cir. 1975) (interpreting phrase "endangering the health or welfare of persons" from Federal Water Pollution Control Act to cover discharge of "potentially harmful" substance that gave "rise to a reasonable medical concern over the public health"); *Maine People's All. v. Mallinckrodt, Inc.*, 471 F.3d 277, 296 (1st Cir. 2006) (holding that, under Resource Conservation and Recovery Act (RCRA), "an imminent and substantial endangerment
(continued...)

AS 46.03.822.[42]

The superior court relied on the evidence presented at trial to find that sulfolane "presents an imminent and substantial danger to the public health" under its interpretation of AS 46.03.826(5)(A) — that it "presents a reasonable medical concern, the nature of which is serious, and the threat of which is present when sulfolane is released in the environment." The State called Dr. Ted Wu, a DEC employee and expert in toxicology and environmental chemistry who reviewed the evidence of contamination at the refinery. He testified about a number of studies demonstrating sulfolane's toxic effects when animals were exposed to it, which could indicate potential adverse effects on humans. He testified that studies showed sulfolane exposure caused "convulsion[s] . . . in squirrel monkeys and rats" and vomiting in squirrel monkeys, decreased kidney and liver functions and white blood cell counts in guinea pigs and rats, increased aggression in dogs, and increased fetal absorption and deformation in fetuses in rats and guinea pigs. Dr. Wu explained that squirrel monkeys were more susceptible to sulfolane than were rodents, suggesting that humans could be even more susceptible than squirrel monkeys. Dr. Wu also testified that sulfolane is more toxic than about half of the hazardous substances already identified in DEC's default groundwater cleanup level table and that sulfolane travels in groundwater to drinking water wells and thereby

---

[41]     (...continued)
requires a reasonable prospect of a near-term threat of serious potential harm"); *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 210 (2d Cir. 2009) (discussing "imminency" as used in RCRA to require only "a showing that a 'risk of threatened harm is present' " (quoting *Dague v. City of Burlington*, 935 F.2d 1343, 1356 (2d Cir. 1991))).

[42]     *See Berg v. Popham*, 113 P.3d 604, 609 (Alaska 2005) (interpreting AS 46.03.822(a) to impose broader arranger liability than that imposed by CERCLA); *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 765 (Alaska 1999) (adopting a broad, flexible definition of AS 46.03.822(a)'s cost clauses).

creates a risk to the public.

The State also called Dr. Mary Beth Leigh, a professor of microbiology at the University of Alaska Fairbanks, to provide expert testimony about her own experiments that showed sulfolane was toxic to a bacterium commonly used as a screening tool for toxicity to organisms. The State called former DEC Commissioner Larry Hartig and former North Pole Mayor Bryce Ward to testify about sulfolane's impact on public welfare and the factors involved in gauging public welfare. Hartig testified that he understood the legislature's intent to be that public welfare includes the people's "overall health and welfare," as well as their "economic well-being" and their "opportunity to have a living" and "subsistence." Ward testified about the negative impact sulfolane contamination had on the North Pole community, causing residents to be upset and concerned about the amount of sulfolane to which they were unwittingly exposed.

Hartig also testified that DEC considered sulfolane a hazardous substance in order to address the sulfolane plume with funding from the Oil and Hazardous Substance Release Response Act Account.[43] Funds from the account are available expressly to cover State response costs in the event of oil or hazardous substance releases.[44] The definitions of "oil" and "hazardous substance" in the enabling legislation are virtually the same as those in AS 46.03.826. To obtain funds from the response account, the DEC commissioner must find that the oil or hazardous substance released "poses an imminent and substantial threat to public health or welfare, or to the

---

[43] *See* AS 46.08.005-.080; AS 46.08.005 (establishing fund available to respond to release of oil or hazardous substance "to reduce the amount, degree, or intensity of a release or threatened release, and for other related purposes identified in law").

[44] AS 46.08.040(a), .045.

environment,"[45] a phrase that is virtually identical to the definition of "hazardous substance" in AS 46.03.826(5)(A).

The State introduced Williams's written emergency medical care policy into evidence. The policy described possible life-threatening effects of sulfolane if inhaled, ingested, or in contact with the skin or eyes. It listed "[c]ardiac arrhythmias, respiratory failure, pulmonary edema, paralysis, brain damage, liver damage, lung tissue and stomach tissue damage" as possible side effects from sulfolane exposure.

Williams presented deposition testimony from Stephanie Buss, a former DEC employee and toxicologist. When asked to identify "every single fact . . . that would indicate that sulfolane is and presents an imminent and substantial danger to the public health and welfare," Buss stated that "toxicity studies . . . indicat[ed] adverse health effects" and proceeded to identify various studies. She also referred to studies indicating that sulfolane posed dangers not only to public health and welfare, but also to "fish and vegetation."

Williams also called James Fish, a DEC employee and project manager for the refinery contamination area. Fish testified that the EPA had previously treated sulfolane as a hazardous substance at a refinery in Puerto Rico. He testified that the EPA's approach to the Puerto Rican refinery supported DEC's decision to consider sulfolane a hazardous substance.

The superior court relied heavily on Dr. Wu's testimony to determine that sulfolane is a hazardous substance under AS 46.03.826(5)(A) based on the danger it posed to public health and welfare. It found Dr. Wu's medical concerns about sulfolane were both "reasonable and serious" and that "[a]t a minimum, sulfolane exposure can reduce white blood cell counts; at a maximum sulfolane exposure can cause death." The

---

[45]     AS 46.08.040(a)(1)(A).

court also found it notable that, while operating the refinery, Williams itself treated sulfolane in its emergency medical care policy as though it were life-threatening.

In addition to sulfolane's demonstrated toxicity, the superior court was troubled by its chemical properties as well as the concentrations in which it had been released. The court was not convinced that sulfolane concentrations found in the environment after it was released were material to establishing whether sulfolane was hazardous, but it was persuaded that the concentrations at the time of release "into the subsurface land and water of the State presented an imminent and substantial danger to the public health and welfare."

The court also found that DEC's treatment of sulfolane as a hazardous substance under AS 46.03.826(5)(A) was entitled to deference. The court reasoned that "Hartig accessed the [Oil and Hazardous Substance Release] [R]esponse [A]ccount several times to address the sulfolane contamination," and each time he had to determine that "the contamination posed an imminent and substantial threat" to the public health and welfare or to the environment. The court found that these actions by DEC reflected "the agency's conclusions both that sulfolane is a hazardous substance *and* that the release at issue is posing an imminent and substantial threat to public health, welfare, or the environment"; "DEC's determination that sulfolane is a hazardous substance is reasonable, supported by the record, and not an abuse of discretion"; and DEC's determination "is entitled to judicial deference and it is therefore controlling in this case." The court similarly concluded that sulfolane is a hazardous substance because it also "presents an imminent and substantial danger to public welfare." In its underlying findings the court specifically cited the testimony from former officials and scientists about sulfolane's impacts on the public health and welfare.

In addition to trial evidence, the superior court relied on admissions in Williams's pleadings to support its conclusion that sulfolane was a hazardous substance.

The State's 2014 complaint alleged that "[s]ulfolane is a hazardous substance within the meaning of AS 46.03.745, AS 46.03.900, AS 46.03.826, and 18 AAC 75.990." Williams initially admitted that allegation, but denied that DEC "considered sulfolane to be a hazardous substance under any statute or regulation at any time during [Williams]'s ownership and operation of the North Pole Refinery." Williams later amended its answer, retaining the sentence denying DEC's classification of sulfolane as a hazardous substance, but instead asserting that the State's allegation that sulfolane is a hazardous substance was a "legal conclusion to which no response [was] required." But Williams did not withdraw an earlier stipulation agreeing that "Flint Hills is a liable landowner and operator under AS 46.03.822(a) for sulfolane releases."

The superior court gave some weight to Williams's initial admission and its stipulation. The court found that Williams's "first answer constitute[d] an evidentiary admission that sulfolane is a hazardous substance, notwithstanding Williams'[s]" amended pleading, finding support in *Brigman v. State*, which recognizes that "[c]ourts often admit superseded or withdrawn pleadings in civil and criminal cases on the theory that they constitute evidentiary admissions."[46] The court also found that Williams admitted that sulfolane is a hazardous substance when it stipulated as to Flint Hills's liability for sulfolane. The court reasoned that "Flint Hills could not be liable under AS 46.03.822(a) for sulfolane releases if sulfolane were not a hazardous substance. If sulfolane is a hazardous substance when released by Flint Hills, it is a hazardous substance when released by Williams."

In addition to holding Williams strictly liable under AS 46.03.822 due to hazardous substance releases as defined in AS 46.03.826(5)(A), the court held Williams strictly liable under section .822 because many of the releases were sulfolane mixed with

---

[46] 64 P.3d 152, 166 (Alaska App. 2003).

oil and because sulfolane wastewater constituted a "petroleum-related byproduct" under AS 46.03.826(5)(B) and AS 46.03.826(7).[47] The court found that sulfolane was "released as a constituent of Williams'[s] oil spills" and that "Williams had numerous spills of gasoline containing sulfolane at the refinery."

Finally, the court concluded that sulfolane is a hazardous substance under AS 46.03.826(5)(C). Subsection .826(5)(C) defines as hazardous any "substance defined as a hazardous substance under 42 U.S.C. 9601(14)," CERCLA's expansive definition of hazardous substance that includes "any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921]" (a section better known as the Resources Conservation and Recovery Act (RCRA)).[48] The court found sulfolane met the hazardous substance definitions under AS 46.03.826(5)(C) because the EPA had treated it as hazardous waste under RCRA when it was released at a refinery in Puerto Rico.

Williams argues that the superior court misinterpreted the law when it found that sulfolane met any of the statutory definitions of hazardous substance in AS 46.03.826(5). Regarding subsection .826(5)(A), Williams argues that the court's definition of "imminent" does not comport with dictionary or judicial definitions of the word. It contends that an "imminent danger" must be one that "threaten[s] to occur immediately,"[49] not one that may take time to develop. Quoting the court's

---

[47] AS 46.03.826(5)(B) (defining "hazardous substance" to include "oil"); AS 46.03.826(7) (defining "oil" to include "petroleum-related product or by-product").

[48] 42 U.S.C. § 9601(14) (governing disposal of hazardous and non-hazardous solid waste).

[49] Quoting *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 485 (1996) (citing WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE at 1245 (2d (continued...)

memorandum adopting a tentative definition of hazardous substance, Williams alleges that the court improperly concluded that "imminent and substantial danger to public health" meant only a "reasonable medical concern about the public health."[50] Williams argues that this definition of "imminent and substantial danger" has never been "adopted by any court, applied by DEC, or advocated by any party during five years of litigation"; that it runs counter to the plain language of the statute; that it "threatens to deprive a

---

[49]    (...continued)
ed. 1934)).

[50]    This misrepresents the superior court's definition. The court did not conclude that an "imminent and substantial danger" meant *only* a "reasonable medical concern about the public health," but also that, "given the modifier 'substantial,' the nature of the harm giving rise to concern is serious and, given the modifier 'imminent,' the threat of harm must be present, although the potential impacts may never develop or may take time to develop."

Moreover, the court ultimately made separate findings that sulfolane presented an imminent and substantial danger to the public health *and* welfare. Williams's opening brief primarily argues against the danger to public health finding. Its arguments about the public welfare findings are limited to a single footnote in its opening brief that simply incorporates "all the above reasons why sulfolane is not a hazardous substance in the first instance." Williams's reply brief claims that the arguments are interchangeable. Williams does not challenge the court's factual findings about the impact on North Pole residents or its finding that residents' concerns about "economic well-being [and] opportunity to have a living" are incorporated in the public welfare prong of the definition, and fails to adequately address this issue. We thus consider Williams's challenge to the court's finding waived. *See* Alaska R. App. P. 212(c)(1)(H) (requiring that argument section "explain the contentions of the appellant . . . and the legal and factual support for those contentions, with citations to the authorities, statutes, and parts of the record relied on"); *Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1062 (Alaska 2005) ("We do not consider arguments that are inadequately briefed.").

defendant of the constitutional right to fair notice" under *Stock v. State*;[51] and that it is contrary to the legislative history. Williams also argues that because the concentrations of sulfolane "had decreased dramatically and were nowhere near the ranges cited by the court" by the time the plume reached drinking water wells, the court erred by finding that sulfolane was hazardous at the time of release.

The State responds that Williams's proposed definition of "imminent" is flawed because it would exclude substances causing delayed manifestations of harm, such as birth defects or cancer. The State emphasizes that the statute uses the word "danger" rather than "harm" to signify the possibility of harm, rather than the present existence of harm. And it argues that, even under Williams's proposed interpretation of AS 46.03.826(5)(A), trial evidence supports finding sulfolane is a hazardous substance. The State points to the numerous studies demonstrating sulfolane's harmful effects on animals. The State asserts that there is no legal support for Williams's contention that "whether a substance is hazardous should turn on its concentrations in the environment after decades of dilution."

Williams also asserts that the superior court improperly relied on evidence from Dr. Wu and DEC employee Stephanie Buss because, although they indicated they believed sulfolane was a hazardous substance, they did not state explicitly that it "presents an imminent and substantial danger to public health." Williams argues that it was error to infer that sulfolane is a hazardous substance, pointing to a ruling on the parties' 2018 motions for summary judgment which discounted Dr. Wu's affidavit for not using these statutory terms. The State responds that "[n]o rule of evidence says that witness testimony 'must be excluded' and cannot be used to support a factual finding if

---

[51]     526 P.2d 3 (Alaska 1974) (explaining circumstances under which environmental conservation statutes might be unconstitutionally vague). We address fair notice and due process in part IV.A.5 below.

-26-                                    7658

it does not use particular words from a statutory definition." The State also points out that Williams did not "cit[e] contrary evidence or explain [in its brief] why the studies do not show that sulfolane is dangerous."

When we interpret a statute, we presume "that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous."[52] We apply a "sliding-scale approach" to interpret the language: "[t]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be."[53] To the extent possible, we "interpret each part or section of a statute with every other part or section, so as to create a harmonious whole."[54] Whether a substance meets the legal standard of "hazardous substance" is a "question of law to which we apply our independent judgment."[55]

We are not persuaded by Williams's arguments. The two key issues are whether "imminent" dangers under AS 46.03.826(5)(A) can include non-immediate dangers and whether the facts support concluding sulfolane is a hazardous substance.

Turning to the first issue, we note that because the parties do not discuss the legislative history of the statute,[56] we look primarily to the plain meaning of the statute.

---

[52]     *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 761 (Alaska 1999) (quoting *Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 530-31 (Alaska 1993)).

[53]     *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019) (quoting *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016)).

[54]     *Id.* (original alteration omitted) (quoting *Rydwell*, 864 P.2d at 528).

[55]     *See Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 392 (Alaska 2017).

[56]     Williams alludes to its October 2019 response to the court's interpretation of "imminent and substantial danger," when Williams did engage in a legislative history analysis. However, it makes no arguments now on appeal beyond (1) asserting that
(continued...)

The undefined use of "imminent" in statutes and treaties, across diverse subject areas, has plagued legal scholars for decades.[57] When the legislature enacted AS 46.03.826(5)(A), Black's Law Dictionary defined "imminent" as something "[n]ear at hand; mediate rather than immediate; . . . impending; on the point of happening; threatening."[58] It defined "danger" as "[j]eopardy; exposure to loss or injury; peril."[59] Similarly, Merriam-Webster's Collegiate Dictionary defined "imminent" as "ready to take place"[60] and "danger" as "exposure or liability to injury, pain, or loss."[61] While an "imminent danger" is thus typically some harm that is threatening to occur immediately, the fact that harm ultimately did not occur does not mean that the harm was not imminent

---

[56]     (...continued)
AS 46.03.826(5)(A) was enacted prior to subsection .826(5)(C) and thus could not have been designed to expand subsection .826(5)(C); and (2) making conclusory statements that the court's interpretation of imminent and substantial danger "finds no support in the statutory text or the legislative history." "[A] party's briefing must contain its own arguments and may not merely incorporate arguments from other documents." *McCormick v. Chippewa, Inc.*, 459 P.3d 1172, 1180 (Alaska 2020). We conclude Williams's legislative history arguments were insufficiently briefed and thus waived.

[57]     *See, e.g.*, Authority of the President Under Domestic and International Law to Use Military Force Against Iraq, 26 Op. O.L.C. 143, 182-84 (2002) (discussing ambiguities of "imminent" in international law, including temporal elements, probabilities that threat will materialize, and magnitude of harm that threat would cause such that immediacy is no longer required).

[58]     *Imminent*, BLACK'S LAW DICTIONARY (rev. 4th ed. 1968) (similarly defined in current 11th edition).

[59]     *Danger*, *id.* (similarly defined in current 11th edition). Black's Law Dictionary also provides a definition for "imminent danger," but it applies to the use of self-defense and seems inapplicable to environmental harms.

[60]     *Imminent*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (7th ed. 1963).

[61]     *Danger*, *id.*

at one point. Federal case law cited by the superior court and both parties supports this interpretation of "imminent danger."[62] The court's interpretation of "imminent" — that "the threat of harm must be present, although the potential impacts may never develop or may take time to develop" — aligns with the plain definition of statutory terms as well as federal case law interpreting like terms.

Williams's factual and evidentiary challenges to the hazardous substance conclusion also fail to withstand scrutiny. Williams does not cite any case law or rules of evidence to support its argument that expert testimony must exactly track the relevant statutory text at issue.[63] Alaska Evidence Rule 702(a) allows qualified experts to rely on their "scientific, technical, or other specialized knowledge" to express opinions that will "assist the trier of fact to understand the evidence or to determine a fact in issue." There is no indication that it would be improper for the trier of fact to rely on expert testimony if the expert fails to repeat verbatim the statutory language at issue while offering an opinion. Dr. Wu's and Buss's testimony demonstrated that sulfolane, "when it enters . . .

---

[62] *See Meghrig v. KFC W., Inc.*, 516 U.S. 479, 485-86 (1996) (interpreting RCRA's "imminent and substantial endangerment" provision as requiring threat of danger to be then-present even if impact may not be felt until later); *Reserve Mining Co. v. EPA*, 514 F.2d 492, 528-29 (8th Cir. 1975) (interpreting phrase "endangering the health or welfare of persons" from Federal Water Pollution Control Act to cover discharge of "potentially harmful" substance that gave "rise to a reasonable medical concern over the public health"); *Maine People's All. v. Mallinckrodt*, 471 F.3d 277, 296 (1st Cir. 2006) (holding that, under RCRA, "an imminent and substantial endangerment requires a reasonable prospect of a near-term threat of serious potential harm"); *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 210 (2d Cir. 2009) (stating "imminency" standard in RCRA "requires a showing that a 'risk of threatened harm is present' " (quoting *Dague v. City of Burlington*, 935 F.2d 1343, 1356 (2d Cir. 1991))).

[63] *See Marcia V. v. State, Off. of Child.'s Servs.*, 201 P.3d 496, 508 (Alaska 2009) (rejecting argument that expert testimony must recite statutory language).

in or upon the water or surface or subsurface land[,] . . . presents an imminent and substantial danger to the public health . . . including . . . to fish, animals, vegetation, or any part of the natural habitat in which they are found."[64]  Dr. Wu testified extensively about sulfolane's toxic effects on animals exposed to it.  And Williams mischaracterizes Buss's deposition testimony, alleging she concluded sulfolane was a hazardous substance based only on studies showing that "sulfolane has the potential to have adverse effects." (Emphasis omitted).  But Buss also discussed a study showing "significant impacts of high concentrations of exposure."  Her deposition testimony indicates that she believed sulfolane posed an imminent and substantial danger to the public health or welfare, but she clarified that none of the studies to which she referred used those words so she avoided saying that a study made such an explicit finding.  That Dr. Wu and Buss never expressly stated "sulfolane presented an imminent and substantial danger to public health" did not preclude the superior court from making such a finding, especially in light of the ample evidence suggesting that fact.  The superior court did not err by relying on Dr. Wu's and Buss's testimony when making its findings.

Other testimony from Dr. Wu further supports finding sulfolane presents an imminent and substantial danger to the public health or welfare.  He testified about studies showing negative impacts on plants, earthworms, aquatic invertebrates, and fish when exposed to sulfolane, including a study demonstrating impacts on embryonic development in zebrafish when exposed to a range of sulfolane concentrations equivalent to concentrations found in groundwater near refineries around the world.  And the fact that Williams itself treated sulfolane as a substance with life-threatening characteristics while handling it further supports the court's hazardous substance finding.

The superior court also did not abuse its discretion by giving weight to

---

[64]     AS 46.03.826(5)(A).

Williams's initial admission that sulfolane was a hazardous substance, which could shed light on Williams's own beliefs about whether sulfolane was hazardous.[65] Williams failed to refute the inferences that could be drawn from its earlier admission, especially when those inferences were supported by Williams's own sulfolane-handling practices at the refinery.[66]

### 2. The superior court did not err by awarding response costs to the State and Flint Hills.

Alaska Statute 46.03.822(a) imposes strict liability on those responsible for the unpermitted release of hazardous substances for a range of costs, including response costs. "Response costs" are defined by regulation as "costs reasonably attributable to the

---

[65] In contrast to binding judicial admissions, "evidential admissions are words or conduct admissible in evidence against the party making them, but subject to rebuttal or denial." 29A AM. JUR. 2D *Evidence* § 769; *see* 2 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE § 254 (8th ed. 2020) (defining "judicial admission"). "Evidentiary admissions may also be made in pleadings that have been superseded, amended, or withdrawn; answers to interrogatories; and other statements made pursuant to the . . . Rule of Evidence governing statements by opposing parties." 29A AM. JUR. 2D *Evidence* § 769. Admissions constituting opinion, such as a conclusion of law,

> normally include an application of a standard to the facts. Thus, they reveal the facts as the declarant thinks them to be, to which the . . . legal or moral standard involved in the statement was applied. In these circumstances, the factual information conveyed should not be ignored merely because the statement may also indicate the party's assumptions about the law.

BROUN, *supra*, § 256 (citations omitted); *see also Cikan v. ARCO Alaska, Inc.*, 125 P.3d 335, 341 (Alaska 2005).

[66] Because we affirm the superior court's conclusion that sulfolane is a hazardous substance under AS 46.03.826(5)(A), it is not necessary for us to address the extent to which sulfolane may also be defined as a hazardous substance under subsections AS 46.03.826(5)(B) and (C).

site or incident" including "the costs of direct investigation, containment and cleanup, removal, and remedial actions associated with an incident or site undertaken by the department . . . as well as the costs of oversight."[67]

The superior court found that the State's and Flint Hills's plans to "provide alternative water in the form of a piped water expansion project [were] reasonable and not arbitrary or capricious." There was expert testimony that groundwater remediation would likely cost at least $6 million more than expanding the piped water system, and would take decades to achieve. The court found "Williams . . . liable for the estimated costs of the piped water system, $72,228,154, as an appropriate response cost under .822(a)."[68] Other response costs included those incurred by Flint Hills to deliver bulk and bottled water in the interim and to drill new public wells after sulfolane was detected in the City's source wells. The interim water deliveries were part of a project costing $27.67 million, and the new City source wells cost $4.39 million.

Williams argues that the superior court erred by awarding the State response costs for the piped water system and new wells, claiming the piped water system was unnecessary, not cost-effective, and unreasonable. Williams also argues the superior court erred by awarding Flint Hills costs for bottled water to North Pole residents, contending that new wells for the City and "providing alternative water to residents on an interim basis" were unnecessary.

Williams points to several environmental conservation regulations to

---

[67]     18 Alaska Administrative Code (AAC) 75.910(b) (2021).

[68]     The court calculated expected cost for the piped water system — $72,228,154 — based on "payments from escrow to date by the State of $11,599,681 and $44,378,473 from Flint Hills; an additional $16.25 million is expected to be required to complete the project." It then determined that Williams was equitably responsible for 75% of the State's and Flint Hills's future costs related to the piped water system.

support its assertion that "Site Cleanup Rules require those responsible for contamination to take only those actions 'necessary to protect human health, safety, and welfare, and the environment.' "[69] But as the State points out, the standard in the site cleanup regulations differs from that required by statute.[70] The regulations mainly focus on what the responsible party must do to remedy contamination it has caused, which could be read to require only that the responsible party take the minimum protective actions "necessary."[71] But when considered in light of the policy behind the Environmental

---

[69] Quoting 18 AAC 75.335 (requiring responsible party to generate site characterization plans prior to hazardous substance cleanup), and also citing 18 AAC 75.345 (requiring cleanup to meet specific levels), .360 (specifying cleanup operation requirements for responsible party), .380 (detailing responsible party's reporting and site closure requirements), and .990 (chapter definitions, including "cleanup level").

[70] *See* AS 46.03.822(a) (imposing strict liability on responsible parties for damages resulting from "unpermitted release of a hazardous substance," including "costs of response, containment, removal, or remedial action, . . . and for the additional costs of a function or service, including administrative expenses for the incremental costs of providing the function or service"); AS 46.03.824 ("Damages include but are not limited to injury to or loss of persons or property, real or personal, loss of income, loss of the means of producing income, or the loss of an economic benefit."); *see also Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 765 (Alaska 1999) (construing, in dicta, "subsection .822(a)'s statement of specific compensable costs to be exemplary and inclusive, not definitive or exclusive" and "adopt[ing] a literal and inflexible view of subsection .822(a)'s cost clauses would be fundamentally inconsistent with what we perceive to be the legislature's primary intent in enacting these provisions: to hold responsible parties strictly liable for all provable spill-related harms").

[71] *See* 18 AAC 75.990(17) (defining "cleanup" to include "removal of a hazardous substance from the environment, restoration, and other measures that are necessary to mitigate or avoid *further* threat to human health, safety, or welfare, or to the environment" (emphasis added)); 18 AAC 75.335(c)-(d) (describing requirements of site characterization report submitted to DEC and allowing DEC to "modify proposed cleanup techniques or require additional cleanup techniques for the site as the department
(continued...)

-33- **7658**

Conservation Act and its enabling regulations, it is more likely that the provisions Williams cites operate to establish a baseline cleanup level for the responsible parties, and not a ceiling for the State to respond to the contamination.[72] The State incurred costs as a result of Williams's hazardous substance releases and Williams is therefore strictly liable for them.

Williams further argues that the piped water system was unnecessary because DEC had not established a cleanup level required to make the groundwater safe for human consumption[73] and the court had not made findings that piped water was

[71] (...continued)
determines to be necessary to protect human health, safety, and welfare, and the environment"); 18 AAC 75.345(c) (allowing DEC to set more stringent groundwater cleanup levels than those currently published if it "determines that a more stringent cleanup level is necessary to ensure protection of human health, safety, or welfare, or of the environment"); 18 AAC 75.345(d) (allowing DEC to "require a responsible person to provide an alternative source of drinking water for the affected parties or implement other institutional controls . . . until a cleanup level is established" when "toxicity information is insufficient to establish a cleanup level for a hazardous substance or a pollutant that ensures protection of human health, safety, and welfare, and of the environment").

[72] *See* 18 AAC 75.910(b) (holding responsible parties liable for "response costs" and defining response costs as "costs reasonably attributable to the site or incident" including "costs of direct investigation, containment and cleanup, removal, and remedial actions associated with an incident or site undertaken by the department . . . as well as the costs of oversight"); *see also* AS 46.03.760(d) (holding responsible person "liable to the state . . . for the full amount of actual damages caused to the state by the violation, including" costs for abatement, containment, restoration, and emergency response costs); AS 46.03.780 (allowing for broad recovery when hazardous substance release "injures or degrades the environment").

[73] DEC had not yet set cleanup levels because of uncertainty about its toxicity data for sulfolane. In 2015 the EPA recommended that DEC refrain from doing so until the EPA had completed its own toxicity studies evaluating the health effects of sulfolane
(continued...)

necessary for human or environmental health. For example, Williams claims there was no evidence demonstrating that "the low levels of sulfolane in North Pole area wells have caused adverse health effects." The State again points to the text of AS 46.03.822, where the extent of liability and recovery is untethered to findings of "necessity" or "cleanup levels." The State argues that Williams could have proposed a cleanup level[74] and Williams's failure to participate "in the regulatory process . . . puts it in a poor position to now raise regulation-based objections to DEC's response." Furthermore, regulations expressly allow DEC to require a responsible person to provide alternative water sources when "toxicity information is insufficient to establish a cleanup level for a hazardous substance or a pollutant."[75] And, as discussed below, feasibility studies showed that alternatives to the piped water system such as remediating the groundwater would be costly, difficult to implement, uncertain to succeed, and could pose additional risks. Thus establishing a level to which groundwater concentrations would need to have been returned was irrelevant in these circumstances. The superior court properly concluded that the statutes did not require the State to prove that the piped water system was necessary.[76]

---

[73]     (...continued)
exposure.

[74]     *See* 18 AAC 75.345(b)(3) (allowing DEC to approve responsible party's proposed alternative cleanup level).

[75]     18 AAC 75.345(d).

[76]     While Williams alleges that the State had ulterior motives in its pursuit of the piped water system – to "save face with the public" and to remedy other non-sulfolane contamination problems with well water – our review of the record reveals no such bad-faith motives.

In contrast, Williams's argument borders on bad faith when it selectively
(continued...)

Williams next argues that the piped water system is not cost-effective, and thus is not "practicable" as required by regulation.[77] Williams alleges that "[n]either the State nor Flint Hills offered any evidence that the piped water system was the most cost-effective remedy" and that State witnesses conceded that this was not a factor DEC considered. While the State mostly focuses on the absence of any statute requiring that it prove piped water is the most cost-effective remedy, it also points to witness testimony discussing the benefits of piped water over other alternatives. The State noted that its permanency, cost, safety, and reliability made piped water superior to delivering bottled water or to "restor[ing] the aquifer to its natural condition." Williams's sole proposal besides doing nothing was to conduct air sparging, a form of remediating the aquifer that DEC, as well as Flint Hills's environmental contractor, had already considered and

_____

[76]      (...continued)
relies on a DEC employee's testimony to claim that the State sought "to remedy water quality issues unrelated to sulfolane that make the well water 'unpalatable without treatment.' " The employee, referring to aesthetic differences, said the water was "a little unpalatable without treatment." And Williams's references to other contamination are unsupported by the record and are irrelevant to assessing the response costs the State incurred out of concern for the potential public health and welfare impacts from sulfolane contamination.

[77]      "Practicable" is defined as "capable of being designed, constructed, and implemented in a reliable and cost-effective manner, taking into consideration existing technology, site location, and logistics in light of overall project purposes." 18 AAC 75.990(93). The definition "does not include an alternative if the incremental cost of the alternative is substantial and disproportionate to the incremental degree of protection provided by the alternative as compared to another lower cost alternative." *Id.*

Williams cites 18 AAC 75.325(f)(1)(D) to support its assertion. In relevant part, this section instructs a responsible person, "to the maximum extent practicable, . . . [to] prevent, eliminate, or minimize potential adverse impacts to human health, safety, and welfare, and to the environment, onsite and offsite, from any hazardous substance remaining at the site." 18 AAC 75.325(f)(1)(D). Williams mischaracterizes this as a requirement for DEC, rather than the responsible party.

determined would be costly, ineffective, and could pose additional risks to the community.

Williams further asserts that the piped water system's cost was exorbitant rather than cost-effective because "[o]nly 86 private wells . . . in recent years" recorded measurements of at least 20 ppb of sulfolane. Williams therefore calculated the cost of the piped water amounted to "over $837,000 per affected well." The State responds that the statute imposes strict liability for actual damages and response costs rather than for only the most cost-effective measures taken.[78] Flint Hills points to trial testimony tending to show cost-effectiveness for the piped water system was considered both in its design and at trial. The record also reveals that the sulfolane plume is migrating and not expected to degrade quickly, and that the uncertainty about effects of long-term exposure to sulfolane justifies preventative measures such as the piped water system.

Even if the statutes or regulations required that response costs be "necessary" and cost-effective, the State persuasively argues that the record supports such a finding. The superior court found that the piped water system would be "reasonable and not arbitrary or capricious" as an alternative water source because it is a common solution for large-scale groundwater contamination, offers an effective long-term solution, would require less maintenance, and would be more convenient. Furthermore, testimony from Williams's own experts supports finding that the interim bottled water deliveries and piped water system design were reasonable.

The record supports the superior court's decision to hold Williams liable

---

[78] *See* AS 46.03.760(d) (holding responsible party "liable to the state . . . for the full amount of actual damages caused to the state by the violation, including" costs for abatement, containment, restoration, and emergency response costs); AS 46.03.780 (allowing for broad recovery when hazardous substance release "injures or degrades the environment").

for the response costs for the piped water system, interim water provisions, new wells, and public outreach. The court did not clearly err by finding they were reasonable resolutions to the sulfolane groundwater contamination. We affirm the award of response costs to the State and Flint Hills for Williams's sulfolane releases under AS 46.03.822.

### 3. The superior court did not err by awarding damages for loss of access to groundwater due to sulfolane contamination.

The superior court determined there was a "component of natural resources damage" from sulfolane "that [was] not addressed by the provision of alternative water supplies," i.e., "loss of the right of the public to have access to uncontaminated groundwater." The court noted that some people might prefer using well water, and it noted that if the sulfolane plume migrates — as is predicted — to areas beyond the piped water system, the impact might create further burdens given the "inconveniences and limitations" of installing water filtration systems for well water in those areas. The court explained that, while in some instances it might not be strictly necessary for residents to use groundwater since they might have alternatives, Williams's sulfolane releases had affected people's access to groundwater due to pollution and this was an "uncompensated 'adverse environmental effect' " per AS 46.03.760(a)(1) which was "deserving of reasonable compensation." The court awarded $2,533,125 to the State for Williams's 75% responsibility for the groundwater-related damages.

Williams claims that awarding damages based on the public's loss of "the option to choose" to access uncontaminated groundwater was error. Williams argues, first, that no such right to uncontaminated groundwater exists under state law and that the court based this right only on "its speculation that '[s]ome people may prefer well water,' " for which there was no evidence. Williams further argues that even if a right to access uncontaminated groundwater existed, it is held by the public; thus, the State is

not harmed and cannot recover damages.

Williams is incorrect that the superior court based the existence of the right solely on residents' potential subjective preference for groundwater. The court noted that preference but also considered other reasons why access to groundwater was important to the public. For instance, areas not served by the piped water system would have limited and costly means for access to clean water.

Williams is also incorrect that there is no basis in state law to award damages for the loss of access to groundwater. Liability for such contamination is explicitly laid out in AS 46.03.760. The statute provides that a person who violates the Act is liable to the State for damages in the form of a civil assessment.[79] Even if there were no independent right of access to clean groundwater, the State could pursue damages for harm to this natural resource based on Williams's violations of the Act.

Furthermore, Williams's argument that the State cannot pursue legal action for harm to a right held by the public ignores the State's role as trustee of public trust resources. As we have explained, "[t]he public trust doctrine provides that the State holds certain resources (such as wildlife, minerals, and water rights) in trust for public use, 'and that government owes a fiduciary duty to manage such resources for the common good of the public as beneficiary.' "[80] Alaska's Constitution provides that "[w]herever occurring in their natural state, . . . waters are reserved to the people for

---

[79]    AS 46.03.760(a).

[80]    *Kanuk ex rel. Kanuk v. State, Dep't of Nat. Res.*, 335 P.3d 1088, 1099-1100 (Alaska 2014) (quoting *Baxley v. State*, 958 P.2d 422, 434 (Alaska 1998)); *see also* AS 46.03.010 (articulating policy of environmental conservation statutes to "enhance the health, safety, and welfare of the people . . . and their overall economic and social well-being," and to coordinate resource management "to the end that the state may fulfill its responsibility as trustee of the environment for the present and future generations").

common use,"[81] articulating the public trust doctrine for Alaska's waters.[82] "Waters" comprising the public trust are broadly defined.[83] Besides navigable waters, this includes "public water,"[84] which is defined as "all other water, whether inland or coastal, fresh or salt, that is reasonably suitable for public use and utility."[85] Thus, groundwater is a public trust resource over which the State serves as trustee.[86]

---

[81] Alaska Const. art. VIII, § 3. These rights are subject to appropriation and reservation rights. *Id.* at § 13. Alaska's Water Use Act, codified at AS 46.15.010-.270, reiterates these provisions and regulates water appropriation and reservation. AS 46.15.030.

[82] *See Kanuk*, 335 P.3d at 1099 ("We have frequently compared the state's duties as set forth in [a]rticle VIII to a trust-like relationship in which the state holds natural resources such as fish, wildlife, and water in 'trust' for the benefit of all Alaskans." (quoting *Brooks v. Wright*, 971 P.2d 1025, 1031 (Alaska 1999))). *See also* AS 46.03.010(b) ("It is the policy of the state . . . to develop and manage the basic resources of water, land, and air to the end that the state may fulfill its responsibility as trustee of the environment for the present and future generations.").

[83] *Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 492 (Alaska 1988) ("A careful reading of the constitutional minutes establishes that the provisions in article VIII were intended to permit the broadest possible access to and use of state waters by the general public." (quoting *Wernberg v. State*, 516 P.2d 1191, 1198-99 (Alaska 1973))).

[84] *See* AS 38.05.126 (recognizing constitutional right of public access to navigable and public water).

[85] AS 38.05.965(21).

[86] Some other jurisdictions also recognize groundwater as a public trust resource, such as Hawai'i, *In re Water Use Permit Applications*, 9 P.3d 409, 445 (Haw. 2000), and Vermont, Vt. Stat. Ann. tit. 10, § 1390(5). But some jurisdictions have not extended the doctrine or have limited its applicability. *See, e.g.*, *Env't L. Found. v. State Water Res. Control Bd.*, 237 Cal. Rptr. 3d 393, 402 (Cal. App. 2018) (holding public trust doctrine applicable to groundwater extraction only where such extraction impacts
(continued...)

The trust relationship serves as a basis for the State's authority to manage the use of and access to trust resources for "beneficial uses or public purposes."[87] The public trust doctrine has been used to restrain governmental use of public resources,[88] but it also enables the State to recover damages from third parties for harm to trust resources.[89] To make a public trust claim, the government must show that a party caused unreasonable interference with the public's ability to enjoy a public trust resource.[90]

The superior court found that the public's ability to use and enjoy the groundwater was affected by sulfolane contamination. The court noted that "[c]lean water is critically important to the City" and "more than 7,000 people rely on the groundwater for domestic and commercial water needs." The public could no longer safely use the groundwater for these needs because of the sulfolane contamination.

---

[86]     (...continued)
navigable waterways).

[87]     *State, Dep't of Nat. Res. v. Alaska Riverways, Inc.*, 232 P.3d 1203, 1211-12 (Alaska 2010); *see also Brooks v. Wright*, 971 P.2d 1025, 1030 (Alaska 1999).

[88]     *See Kanuk ex rel. Kanuk v. State, Dep't of Nat. Res.*, 335 P.3d 1088, 1102 (Alaska 2014) ("[O]ur past application of public trust principles has been as a restraint on the State's ability to restrict public access to public resources. . . .").

[89]     *Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 495 n.12 (Alaska 1988) (describing *In re Steuart Transp. Co.*, 495 F. Supp. 38, 40 (E.D.Va.1980) as illustrative of public trust basis for "federal and state governments to recover damages for migratory waterfowl killed in oil spill"); *see also* Allan Kanner, *The Public Trust Doctrine,* Parens Patriae*, and the Attorney General as the Guardian of the State's Natural Resources*, 16 DUKE ENV'T L. & POL'Y F. 57, 94 (2005) (citing case law from New Jersey, Maine, and Maryland to support claim that "[t]he right of a state to recover compensatory damages for the destruction of natural [resources] is well established").

[90]     Kanner, *supra* note 90 at 59 (citing WILLIAM H. RODGERS, HORNBOOK ON ENVIRONMENTAL LAW 176 (1977 & Supp. 1984)).

Although the exact nature of the risk posed by sulfolane remains to be understood, there was extensive information in the record to support the superior court's conclusion that it presented a danger to public health and welfare. There was also sufficient evidence in the record that the contamination was caused by "unreasonable" conduct. Williams itself treated sulfolane as a hazardous substance and was aware of potential, if not yet established, environmental impacts. And at least by 1996, Williams was aware that sulfolane was entering the groundwater. Yet Williams used inappropriate wastewater treatment practices, such as directing sulfolane into the wastewater treatment system despite being warned by the sulfolane manufacturer not to do so and knowingly using corroded sumps and leaky wastewater lagoons. Williams unreasonably interfered with the public's use of groundwater resources, and the State could properly pursue damages for that interference.

Williams also argues that even if a right to uncontaminated groundwater exists, awarding damages for its violation would result in an unlawful double assessment of penalties. Williams points out that the superior court determined that imposing damages for the cost of restoring the aquifer to its original condition in addition to imposing damages for the cost of the piping system would be an "inappropriate double assessment of damages." Williams contends that it would therefore be irrational for the court to award both damages for the piping and damages to compensate the public for the loss of the option to choose well water as that, too, would be an inappropriate double assessment.

We disagree with Williams's characterization of the damages as a double assessment. The relevant statutes provide for specific forms of recovery for violations of AS 46.03. Subsection .760(a) provides for civil assessments within a determined range to reflect "reasonable compensation in the nature of liquidated damages for *any adverse environmental effects* caused by the violation," "reasonable costs incurred by the

state in detection, investigation, and attempted correction of the violation," and "economic savings realized by" the violator due to their noncompliance. (Emphasis added.) Section .780 allows costs for restoration following harm to natural resources, providing for damages in "an amount equal to the sum of money required to restock injured land or waters, to replenish a damaged or degraded resource, or to otherwise restore the environment of the state to its condition before the injury."[91]

The superior court explained that the piped water system "substantially replaced the damaged aquifer" in "an economic usage sense," and for this reason awarding the cost of restoring the aquifer in addition to the cost of the piping would be a double recovery. The court also determined that awarding restoration costs twice, under both subsection .760(d) and subsection .780(b), would be duplicative because these were the same categories of loss.

However, the superior court found that the public's loss of its ability to access uncontaminated groundwater was an independent harm that was not addressed by providing alternate water supplies. We agree. The superior court explained that the loss of access is an independent harm: the plume might migrate further to areas that do not have piping and, consequently, alternatives would be inconvenient and limited. New construction or uses — including subsistence uses like growing food — within the existing plume but outside the piping area will be affected by the limited alternative ways to obtain clean water. Furthermore, the damages awarded for loss of groundwater were neither restoration damages covered by section .780 nor a cost expended by the State in "attempted correction of the violation"[92] under subsections .760(a)(2) or .760(d); rather,

---

[91]     AS 46.03.780(b).

[92]     *See* AS 46.03.760(a)(2); *see also* AS 46.03.760(d) (detailing responsible party's liability for state's costs "associated with the abatement, containment, or removal

(continued...)

the groundwater damages were compensation for a *distinct* "adverse environmental effect[]" provided for in subsection .760(a)(1). Awarding damages based on the loss of groundwater access was not duplicative or unfounded, and the superior court did not abuse its discretion by awarding compensation for this loss.

Williams raises a third challenge to the superior court's award under section .760. Williams contends that, even if a groundwater access right exists, it could only be compensated as natural resource damages under section .780. Williams does not explain why section .760 would not apply. The language in subsection .760(a)(1) allowing compensation for "any adverse environmental effects" is broad and allows for recovery related to the groundwater access issue.

Williams further claims that AS 46.03.760(a)(1) "requires a specific finding on the 'degree to which [Williams's releases of sulfolane] degraded the *existing* environmental quality.' "[93] Williams contends that the superior court did not, and could not, make such a finding. We have not had occasion to interpret whether this subsection requires such a finding, or whether it is only one of many possible factors a court may consider "when applicable."[94] But it is unnecessary to decide because the extent of

---

[92]     (...continued)
of the pollutant" and "restoration of the environment").

[93]     Quoting AS 46.03.760(a)(1).

[94]     The statute provides that the sum to be assessed for a violation shall reflect, when applicable,

> (1) reasonable compensation in the nature of liquidated
> damages for any adverse environmental effects caused by the
> violation, which shall be determined by the court according
> to the toxicity, degradability, and dispersal characteristics of
> the substance discharged, the sensitivity of the receiving

(continued...)

degradation in this case was established: previously potable water had been determined to be unusable for drinking and related purposes throughout the three-and-a-half-mile long — and spreading — plume.

It is unclear why Williams claims the court "could not" have made a finding on the degree of degradation. Even if true, that argument is unpersuasive because Williams fails to understand the purpose of liquidated damages in redressing environmental violations. As the superior court explained, liquidated damages may be used when the measure of actual damages is uncertain.[95] The uncertainty often inherent in determining the environmental impacts of pollution is, in part, a reason that liquidated damages were made available by the legislature. It would be nonsensical in this statutory context to preclude an award of liquidated damages due to uncertainty as to the *exact* degree of degradation. The civil assessment statute provides for liquidated damages within a predetermined range, limited by a ceiling established by the legislature, to enable an award for damages that are uncertain and difficult to value. The court's choice of damages within that range was guided by factors listed in the statute and does not reflect an abuse of discretion.

Williams adds that there can be no finding that sulfolane "contaminated" the aquifer because 18 AAC 75.990(22) defines "contaminated groundwater" as water "containing a concentration of a hazardous substance that exceeds the applicable cleanup

---

[94]    (...continued)
environment, and the degree to which the discharge degrades existing environmental quality. . . .

AS 46.03.760(a).

[95]    *See Henash v. Ipalook*, 985 P.2d 442, 447 (Alaska 1999) (discussing various roles for liquidated damages, including as penalty to assist in deterrence or as compensation for damages that are "too obscure and difficult of proof" (quoting *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583-84 (1942))).

level." It claims that because no such cleanup level has been set, there is no "contamination" of the groundwater and instead the State was given a "free pass to recover without an objective standard." This argument is unpersuasive. As discussed, 18 AAC 75 regulates and facilitates site cleanup. It does not purport to define or set out the measures for all potential damages available under the environmental conservation statutes. Thus, applying a definition of "groundwater contamination" drawn from these cleanup regulations is largely irrelevant to determine whether the aquifer was contaminated in violation of a provision of AS 46.03. The superior court correctly said as much in its orders. Second, the provisions that *are* related to cost recovery in 18 AAC 75.910 were promulgated pursuant to AS 46.03.760(d) and AS 46.03.822 (as well as other statutes not relevant here). To the extent that definitions from the administrative regulations apply to damages assessments in AS 46.03, they would apply only to the calculation of "actual damages caused to the state by the violation" associated with remediation and restoration under AS 46.03.760(d), rather than to liquidated damages for "any adverse environmental effects caused by the violation" under subsection .760(a)(1).[96] Williams acknowledges as much, stating that "18 AAC 75.910 expressly covers claims under 46.03.760(d)."

As a final challenge to the access-to-groundwater damages award under section .760, Williams argues that the assessment of liquidated damages against it, covering the eighteen and a half years that Williams operated the refinery, is punitive rather than "compensatory and remedial in nature" as required by the civil assessments statute.[97] Williams claims that punitive damages are not permitted and that it "lawfully"

---

[96] And as the State points out, subsection .760(a) "does not even use the word 'contamination,' " and instead uses the term "adverse environmental effect."

[97] AS 46.03.760(b).

used sulfolane because "DEC *allowed* Williams to leave it in the ground . . . and never once told Williams it was violating the law by doing so." We are not persuaded. When Williams reported it had detected sulfolane in the refinery groundwater, DEC experts expressed uncertainty and some concern about the substance, for which there was a paucity of toxicity information. DEC admitted its lack of information and advised Williams to monitor its releases while DEC investigated the hazardous nature of sulfolane. These actions are not equivalent to *permitting* sulfolane releases. Moreover, as the State correctly argues, Williams's use of sulfolane may have been allowed, but its releases into the soil and water were not; such releases would have required a permit that Williams did not obtain.[98]

We note that CERCLA's regulatory scheme and analogous state statutes such as AS 46.03.822 impose strict liability, even retroactively, and are constructed so that polluters — not the public — bear the risk of uncertainty that the substances they use or dispose of may later be considered hazardous and subject polluters to liability.[99] Holding businesses liable for pollution caused by activities from which they profited is

---

[98]     The superior court concluded likewise in an order denying summary judgment to both Williams and the State for various claims: " '[U]npermitted' means without 'the authority of a valid permit issued by the department or by the Environmental Protection Agency.' Because [Williams] has conceded that it did not have a permit issued by the DEC or EPA to release sulfolane, its release of that substance was unpermitted." And testimony at trial demonstrates that Williams's employees knew they did not have the requisite permits to release sulfolane. *See* AS 46.08.900 (defining "release" and "permitted release").

[99]     *See United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 732 (8th Cir. 1986) (finding CERCLA applies retroactively); *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 762 (Alaska 1999) (finding section .822 analogous to CERCLA in imposing retroactive liability); *see also Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 622 (2009) (Ginsburg, J., dissenting) (discussing CERCLA's polluter pays principle).

not punitive, but is rather a compensatory remedy to spread costs among responsible parties so they are not borne solely by the public. For these reasons, it is not punitive to assess damages over the entire period of Williams's refinery operations in North Pole.

In sum, the superior court did not err by assessing damages under subsection .760(a) for the adverse effect of sulfolane pollution on groundwater and its impact on the public's ability to access the groundwater for consumption. The superior court also properly interpreted the scope of damages permitted by sections .760 and .780, made the requisite factual findings without clear error, and properly exercised its discretion when determining awards that were neither duplicative nor punitive.

### 4. It was error to issue injunctive relief by reference to supporting documents, but the superior court did not err by granting declaratory relief.

The superior court awarded injunctive and declaratory relief to the State and Flint Hills under AS 46.03.765 for PFAS-related claims.[100] The court found "PFOS and PFOA are hazardous substances" under AS 46.03.822 and are "[t]he compounds encompassed by the acronym PFAS." The court also found that no evidence was

---

[100] AS 46.03.765 affords the court "jurisdiction to enjoin a violation of this chapter . . . or of a regulation, a lawful order of the department, or permit, approval, or acceptance, or term or condition of a permit, approval, or acceptance issued under this chapter."

Williams also argues that the superior court erred when it chose not to refer onsite PFAS claims to DEC under the doctrine of primary jurisdiction. When the superior court properly has jurisdiction, its decision to refer an issue to an executive agency is plainly within its discretion and is informed by factors such as judicial economy and administrative expertise. *See Seybert v. Alsworth*, 367 P.3d 32, 39 (Alaska 2016). The superior court did not abuse its discretion, especially in light of years of pretrial litigation of this issue and DEC's determination that Williams was responsible for PFAS and other hazardous substance contamination during its tenure. Referral would not have served the purposes of the primary jurisdiction doctrine.

presented at trial that "PFAS-related products were used or PFAS releases occurred during Flint Hills'[s] tenure at the [refinery]." It therefore declared Flint Hills was not a responsible party under section .822 for onsite PFAS contamination at the refinery. The superior court concluded in paragraph 3(a) of the judgment that Williams was "strictly, jointly, and severally liable for sulfolane, [and] PFAS . . . releases, including liability for the State's future response costs." It therefore declared in paragraph 3(b) that the State could recover 75% of its future costs related to the piped water system. In paragraph 3(d) of the judgment, the court further ordered Williams to "perform and pay for remediation and cleanup efforts as directed by DEC with respect to sulfolane groundwater contamination beyond the . . . Refinery property and with respect to PFAS contamination at the Refinery property." And under paragraph 3(e), the superior court ordered Williams to

    i.    perform monitoring and reporting of sulfolane groundwater contamination beyond the . . . Refinery property boundary required under [DEC] approved plans;

    ii.    address PFAS soil and groundwater contamination at the Refinery property in accordance with DEC requirements, including characterization, monitoring, reporting, containment, and cleanup; [and]

    iii.    otherwise comply with DEC's site cleanup rules, including 18 AAC 75 and other applicable state laws, for sulfolane contamination beyond the Refinery property and PFAS contamination at the Refinery property.

Additionally, the court ordered Williams to "indemnify, defend, hold harmless, and reimburse Flint Hills for 100% of all future costs, expenses, claims, and damages incurred related to [onsite] PFAS contamination."

### a.    Challenges to the injunctive relief

Williams argues that awarding injunctive relief to the State was improper because the State "failed to put on evidence that irreparable injury would result absent injunctive relief." While we have recognized that irreparable harm and inadequate remedies at law are required elements for common law injunctive relief,[101] the State argues that AS 46.03.765 grants the court "jurisdiction to enjoin a violation" of Title 46, Chapter 3, negating the need for the State to show either element.[102] In its reply, Williams argues that AS 46.03.765 permits only "temporary or preliminary relief" and is meant to provide DEC "with a tool to stop a polluter from continuing to release contaminants until final relief may be obtained." But the statute does not prohibit permanent injunctions; it merely provides additional requirements for temporary or preliminary relief due to the reduced opportunity for due process in such situations,[103] further indicating that permanent injunctions — which do not entail those same due process concerns — are permitted. And even those additional requirements for temporary or preliminary relief fall short of requiring irreparable harm.[104] Williams's

---

[101]    *Lee v. Konrad*, 337 P.3d 510, 517 (Alaska 2014) ("Equitable injunctive relief is an extraordinary remedy that is appropriate only where the party requesting relief is likely to suffer irreparable injury and lacks an adequate remedy at law.").

[102]    *See LeDoux v. Kodiak Island Borough*, 827 P.2d 1121, 1123 (Alaska 1992) ("Where a statute specifically authorizes injunctive relief, the plaintiff need not show either irreparable injury or lack of an adequate remedy at law." (quoting *Carroll v. El Dorado Ests. Div. No. 2 Ass'n, Inc.*, 680 P.2d 1158, 1160 (Alaska 1984))).

[103]    *See* AS 46.03.765 ("In actions brought under this section, temporary or preliminary relief may be obtained upon a showing of an imminent threat of continued violation, and probable success on the merits, without the necessity of demonstrating physical irreparable harm.").

[104]    *See id.*

arguments that the injunction should be vacated for failing to meet necessary elements are therefore unpersuasive.

Williams next argues that paragraphs 3(d) and 3(e) of the court's final judgment violate Alaska Civil Rule 65(d) for being too "vague" and "open-ended." Civil Rule 65(d) provides in relevant part that "[e]very order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." First, Williams argues paragraph 3(d) of the judgment is impermissibly vague because: (1) "it identifies no 'remediation and cleanup efforts' that Williams must undertake and the Judgment refers to documents that did not yet exist"; (2) "the injunction's geographic scope to remedy and clean up sulfolane is apparently limitless"; and (3) "there is no time limit on Williams'[s] obligations, which exposes Williams to liability for future costs to remedy releases to which it played no part." Williams challenges paragraph 3(e) of the injunction for similar reasons: it "broadly purports to make Williams responsible *forever* for sulfolane contamination 'beyond the Refinery property,' " and "incorporates all 'applicable' Alaska laws, without further guidance or specificity" leaving Williams unable to determine exactly what conduct is required.[105]

---

[105] *See Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996) (explaining Federal Rule of Civil Procedure 65 regarding injunctions "serves to protect those who are enjoined" by ensuring "an ordinary person . . . should be able to ascertain from the document itself exactly what conduct is proscribed" (quoting 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2955 (1995))); *see also* Fed. R. Civ. P. 65(d) ("Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required.").

(continued...)

The State argues that the order satisfies Civil Rule 65(d)'s specificity requirements by drawing comparisons to an Idaho federal district court opinion—*Idaho Conservation League v. Atlanta Gold Corp.*[106] The State argues that, similar to *Idaho Conservation League*, the court properly ordered Williams "into compliance . . . without directing every step . . . because the duration of the contamination is indefinite and Williams'[s] violations are longstanding and serious."[107] The State next argues that the "site clean-up rules — which the judgment refers to — are specific enough to put Williams on notice of what it must do,"[108] a fact demonstrated after the judgment when "Williams managed to twice submit — and gain approval of — monitoring and characterization plans." Third, the State argues that the cases upon which Williams relies in labelling the injunction as an "obey the law" injunction are distinguishable. Finally, the State disregards Williams's concerns over the injunction's geographically and temporally unlimited reach because the sulfolane plume is similarly unlimited. Williams replies that the State fails to show that "the injunction meets Rule 65(d)'s specificity requirements" and that the distinctions between the cases Williams cites and the facts at

---

[105]    (...continued)
Williams does not specifically challenge paragraph 3(e)(ii) of the judgment. To the extent paragraph 3(e)(ii) is distinct from paragraph 3(d) — both require PFAS cleanup but the latter requires PFAS "characterization, monitoring, reporting [and] containment" at the refinery — we consider any argument against it insufficiently briefed and therefore waived.

[106]    879 F. Supp. 2d 1148 (D. Idaho 2012) (upholding as proper under Federal Rule of Civil Procedure 65(d) trial court's injunction directing defendants to comply with existing Clean Water Act permits without more specificity because parties, not court, are better placed to determine exact method of compliance).

[107]    *Cf. id.* at 1164.

[108]    *See* 18 AAC 75.325-.390 (describing in detail site cleanup rules and site characterization plans).

issue are immaterial.

We agree that the injunctive relief did not satisfy Civil Rule 65(d)'s specificity requirements. Rule 65(d) requires that injunctions "describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." The paragraphs of the judgment that Williams challenges — paragraphs 3(d), 3(e)(i), and 3(e)(iii) — do not describe on their own, with reasonable specificity, the remediation and cleanup efforts Williams will need to undertake. The court's accompanying Memorandum of Decision includes more specificity, but the parties do not discuss whether it is specific enough to satisfy Rule 65(d) or whether mere reference to the Memorandum of Decision satisfies Rule 65(d). We remand the judgment for injunctive relief for more clarity and to explicitly incorporate — not by reference — the language from the Memorandum of Decision, statutes, administrative code, and other documents to which the superior court refers.

### b. Challenges to the declaratory relief

Williams next challenges the superior court's declaratory orders on PFAS at paragraph 3(a) of the court's final judgment. Williams argues that the court improperly declared Williams liable for PFAS generally when only PFOS and PFOA were ever mentioned at trial; that "the State and Flint Hills only presented evidence that Williams used a product that included PFOS," and that Flint Hills should shoulder some of the blame for PFAS.[109]

---

[109] As it did with respect to the injunctive relief discussed above, Williams argues that the declaratory relief for PFAS improperly extends into the future. Because the court's order holds Williams liable for future costs related to the PFAS it released prior to the trial date, this portion of the court-awarded relief is sufficiently specific and does not improperly extend into the future.

Williams also argues that the "declaratory relief in favor of Flint Hills . . .

(continued...)

As Williams acknowledges, " 'PFAS' is not a single substance, but an umbrella term referring to a diverse category of man-made chemicals," including PFOS, PFOA, and more.[110] At trial, Williams representative Randy Newcomer testified that between 1991 and 2000 Williams used only one company's brand of aqueous foams in its fire response practices, and he agreed that the foams contained "perfluoroalkyl substances" including — but not necessarily limited to — PFOS. Dr. Wu also testified that the company's foams marketed and sold during that time listed "organic fluorochemicals" as an ingredient, another phrase for the "PFAS class of compounds," including "PFOS and PFOA." In addition, Williams admitted that "releases of . . . perfluorochemicals occurred" during its tenure at the refinery. There was also contemporary evidence of PFAS contamination more broadly, not just PFOS, in the soil and groundwater at the refinery. Though Williams points to evidence suggesting that Flint Hills *could* have used PFAS during its tenure at the refinery, Williams fails to

---

[109]    (...continued)
already was rejected because Flint Hills had an adequate remedy at law." For support, Williams cites a 2017 pretrial order dismissing Flint Hills's "claims for declaratory judgment and specific performance" against Williams as barred by res judicata in light of *Flint Hills I*, 377 P.3d 959 (Alaska 2016). But the declaratory relief sought in *Flint Hills I* concerned sulfolane rather than PFAS, did not involve State claims, and was dependent on the availability of other legal remedies. *Id.* at 973-74. Williams does not explain how these important differences would justify barring declaratory relief based on res judicata and we see no reversible error on this issue. *See Patterson v. Infinity Ins. Co.*, 303 P.3d 493, 497 (Alaska 2013) ("A judgment is given res judicata effect by this court when it is (1) a final judgment on the merits, (2) from a court of competent jurisdiction, (3) in a dispute between the same parties (or their privies) about the same cause of action." (quoting *Angleton v. Cox*, 238 P.3d 610, 614 (Alaska 2010))).

[110]    *See supra* note 1 (defining PFAS).

identify any evidence that Flint Hills actually did use PFAS-containing products.[111]

Because the record shows that Williams released PFAS during its tenure, the burden was on Williams to prove that it did not use particular PFAS chemicals or to establish that another entity was also liable.[112] The superior court did not err when it declared that no evidence was presented demonstrating Flint Hills used PFAS during its

---

[111]    Williams does not raise the argument that Flint Hills should be liable under AS 46.03.822 for PFAS contamination due to its status as current owner of the facility from where PFAS was released. *See* AS 46.03.822(a)(2), .826(9) (assigning liability to owner of facility from which hazardous substance is released and defining "release" broadly such that PFAS "leaching" from the refinery could fall within definition); *see also* AS 46.03.822(c) (maintaining liability for refinery owners that purchased property with knowledge of earlier releases of hazardous substance).

On appeal, Williams points to several sections of the record purporting to show that "Flint Hills used substantial amounts of 'PFAS' in fire-training exercises and 'hot work' at the refinery." Some of that "evidence" consists of Williams's own proposed findings of fact and testimony from some of its own witnesses speculating about the source of PFAS detections that occurred "upgradient" (i.e., in the opposite direction of water seepage) of firefighting areas. Williams also cites a 2018 DEC report detailing PFAS sampling at the refinery that indicates Flint Hills purchased firefighting foams, but not that those foams contained PFAS. Williams additionally points us to a lengthy 2013 environmental report without explaining its relevance, but that report was excluded from trial on hearsay grounds and, in any event, it suggests Flint Hills purchased foams without PFOS or PFOA.

To the extent there may have been evidence tying Flint Hills to PFAS contamination at the refinery, we consider the argument waived for insufficient briefing and failure to cite relevant evidence in the record. *See Casciola v. F.S. Air Service, Inc.*, 120 P.3d 1059, 1062-63 (Alaska 2005); Alaska R. App. P. 212(c)(1)(H).

[112]    *See* AS 46.03.822; *Oakly Enters., LLC v. NPI, LLC*, 354 P.3d 1073, 1079-80 (Alaska 2015) ("The burden of proof is on the party seeking to avoid joint and several liability . . . ."). Williams had access to the list of PFAS present in the soil and groundwater at the refinery, and does not identify any place in the record where it challenged or otherwise indicated it would challenge its liability for specific PFAS.

time at the refinery, and that Flint Hills was not a responsible party under AS 46.03.822 for PFAS contamination.

### 5. Williams's right to due process was not violated.

Williams argues that DEC's enforcement action and the superior court's finding of liability under section .822 and subsection .826(5)(a) violated the Due Process Clause of the U.S. Constitution[113] and article I, section 7 of the Alaska Constitution[114] because Williams did not have "fair notice" that its conduct was prohibited.

Williams implies that the hazardous substance statutes and regulations are too vague to make it clear whether sulfolane fell within the definition and whether Williams could be liable for its release. Williams claims it relied on agency statements to understand its responsibility. Williams specifically contends that "DEC told Williams that sulfolane was not a hazardous substance and not regulated" and that DEC actually "allowed sulfolane to stay in the ground." As a result it claims that "DEC's actions and communications gave Williams no notice that its conduct created a substantial risk of actual harm." Williams also claims that the superior court's "eve-of-trial interpretation" of the terms "hazardous substance" and "imminent and substantial danger" violated the principles of fair notice because they were a "reversal" of DEC's initial position and a prior superior court decision in the case.

Due process requires that a party be given fair notice before it can be

---

[113] "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

[114] "No person shall be deprived of life, liberty, or property, without due process of law. The right of all persons to fair and just treatment in the course of legislative and executive investigations shall not be infringed." Alaska Const. art. I, § 7.

subjected to liability,[115] at least with regard to "criminal or serious civil penalties."[116] Williams's potential multi-million dollar liability and remediation duties qualify as "serious civil penalties."[117] Whether the constitutional requirements of due process were met is a legal question that we review de novo,[118] but factual determinations such as those regarding the meaning of DEC's communications are reviewed for clear error.[119]

Fair notice is a principle of "basic fairness" which requires that "a statute

---

[115] *See State, Dep't of Revenue v. Nabors Int'l Fin., Inc.*, 514 P.3d 893, 899 (Alaska 2022) (explaining that lack of fair notice, such as through statutory vagueness, "violates the first essential of due process of law" (quoting *Halliburton Energy Servs. v. State, Dep't of Lab., Div. of Lab. Standards & Safety, Occupational Safety & Health Section*, 2 P.3d 41, 51 (Alaska 2000))).

[116] *VECO Int'l, Inc. v. Alaska Pub. Offs. Comm'n*, 753 P.2d 703, 714 (Alaska 1988).

[117] *See id.* at 706 (civil penalty of $72,600 imposed for alleged violations of Alaska Campaign Disclosure Act considered "serious civil penalty"). The State argues that this case does not require fair notice because the hazardous substance statute operates remedially to impose "compensatory liability" rather than "civil or criminal *punishment*." We agree that sections .760, .780, and .822 are not intended to "punish" but rather to compensate for environmental damage. *See* AS 46.03.760(b) (requiring that civil assessments be "compensatory and remedial in nature" rather than punitive). But a "penalty" can be narrowly or broadly defined. *See Penalty*, BLACK'S LAW DICTIONARY (11th ed. 2019) (first describing a penalty as "[p]unishment imposed . . . for either a wrong to the state or a civil wrong (as distinguished from compensation for the injured party's loss)" but then broadly defining civil penalty as "fine assessed for a violation of a statute or regulation"). We assume without deciding that the large statutory assessments awarded against Williams may be considered "penalties" to which fair notice requirements apply.

[118] *See Nabors Int'l Fin., Inc.*, 514 P.3d at 898.

[119] *Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 392 (Alaska 2017).

. . . give adequate notice to the ordinary citizen of what is prohibited."[120] In other words, a statute must not be so vague that people cannot know what they must do or are prohibited from doing. We have explained that even if a statute might in some contexts be too vague to give adequate notice, it "may still pass muster if: (a) there can be no question as to its applicability to the particular offense involved, and (b) a construction may be placed upon the statute so that in the future the type of offenses coming within its purview may reasonably be understood."[121] The regulation of economic activity — such as through antipollution statutes — typically survives a vagueness challenge as long as there is "legislative language which is not so conflicting and confused that it cannot be given meaning in the adjudication process."[122]

In *Stock v. State* we analyzed whether the broad antipollution provision in AS 46.03.710 was void for vagueness.[123] Section .710 states that "[a] person may not pollute or add to the pollution of the air, land, subsurface land, or water of the state." "Pollution" in turn is defined as

> the contamination or altering of waters, land or subsurface
> land of the state in a manner which creates a nuisance or

---

[120] *Stock v. State*, 526 P.2d 3, 8 (Alaska 1974); *see also F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.").

[121] *Stock*, 526 P.2d at 8 (internal citations omitted).

[122] *Lazy Mountain Land Club v. Matanuska-Susitna Borough Bd. of Adjustment & Appeals*, 904 P.2d 373, 383 (Alaska 1995) (quoting *Williams v. State, Dep't of Revenue*, 895 P.2d 99, 105 (Alaska 1995)); *see also id.* (explaining civil penalties and economic regulation are "subject to a less strict vagueness test" than, for instance, speech (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982))).

[123] 526 P.2d at 7-13.

makes waters, land or subsurface land unclean, or noxious, or impure, or unfit so that they are actually or potentially harmful or detrimental or injurious to public health, safety or welfare, to domestic, commercial, industrial, or recreational use, or to livestock, wild animals, bird, fish, or other aquatic life.[124]

We acknowledged there might be borderline or *de minimis* cases when the application of the statute might be unclear, but we refused to analyze the statute in so abstract a manner to determine if it was void for vagueness.[125] Instead, we looked specifically at the act for which Stock was convicted: discharging raw sewage into a stream running through residential areas.[126] This act obviously fell within the statutory definition of "pollution"; even Stock's counsel admitted that a reasonable person would know this.[127] We acknowledged that the term "potentially harmful" in the definition of "pollution" might be vague enough to require a narrowing construction, and we added an element requiring foreseeability which would be used in future applications.[128] But we affirmed the superior court's finding that Stock had violated the provision because Stock's

---

[124]    AS 46.03.900(20) (formerly AS 46.03.900(15)).

[125]    *Stock*, 526 P.2d at 9-10 ("Courts have often recognized that the possibility of difficult or borderline cases will not invalidate a statute where there is a hard core of cases to which the ordinary person would doubtlessly know the statute unquestionably applies.").

[126]    *Id.* at 10.

[127]    *Id.* at 9-11.

[128]    *Id.* at 9-10. We determined that "the statute prohibits acts which a reasonable person would foresee as creating a substantial risk of making water actually injurious to the statutorily protected interests." *Id.* at 10.

conduct so clearly fell within the "hard core" of prohibited conduct.[129] Additionally, we explained that the need for environmental protection, the increasing number of laws and regulations governing disposal of substances used during commercial activity, and the need for the legislature to make broad statutes to balance economic growth with environmental protection all supported our conclusion that the antipollution provisions at issue were not unconstitutionally vague on their face and that Stock was clearly on notice that discharging raw sewage into waterways was improper.[130]

In Williams's case, it is possible that the hazardous substance provisions of section .822 and the statutory definition of hazardous substances in subsection .826(5) could be vague in some instances. But the superior court's findings about sulfolane lead us to conclude sulfolane falls within the "hard core" of the definition of hazardous substance. And Williams itself treated sulfolane as hazardous. Furthermore, Williams may have been allowed to use sulfolane, but it knew that it was not permitted to simply dispose of the substance in any manner it wished. These facts indicate that Williams was on notice of the potential for liability under a gamut of antipollution statutes, including those related to hazardous substances. We conclude that the statute is not so impermissibly vague that it violates Williams's right to due process.

We also disagree that DEC's communications or actions prior to litigation resulted in a lack of fair notice to Williams.[131] DEC's failure to pursue an enforcement

---

[129]     *Id.* at 9-10.

[130]     *Id.* at 12-13.

[131]     The superior court rejected this argument in Williams's cross-motion for summary judgment because it determined that fair notice would be required only when an agency "depart[ed] from its long-established regulations or adjudications." But fair notice requirements apply even when there have not been regulations or adjudications
(continued...)

action with regard to sulfolane was not "acquiescence"[132] to or approval of Williams's conduct. In its communications with Williams, DEC acknowledged that sulfolane was not then regulated as a hazardous substance because very little was known about it and there was a "lack of EPA reviewed toxicity data," and DEC said it first needed to gather more information regarding sulfolane and the pollution issuing from the refinery. It required Williams to conduct further monitoring and stated that it would follow up with further clarification or action. Though Williams claims DEC's communications constituted "written determinations" that sulfolane did not pose a hazard, DEC communicated that sulfolane was not *regulated* at the time, not that it had ultimately concluded it was not hazardous. We conclude the superior court did not clearly err when it found DEC had not promulgated prior interpretations about sulfolane in legal briefs, regulations, or adjudications that Williams might have relied on to claim sulfolane was not hazardous.[133]

---

[131] (...continued)
on point. The U.S. Supreme Court has recognized that while agencies have enforcement discretion and interpretive latitude, if the statutory interpretations are unreasonable or if the conspicuous inaction appears to be for no reason other than acquiescence, "the potential for unfair surprise is acute." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012). Agency actions beyond regulations and adjudications serve to inform regulated entities and therefore are relevant to the fair notice inquiry. However, as we discuss below, DEC did not cause Williams unfair surprise.

[132] *See id.* (recognizing many reasons for agency lack of enforcement and finding lack of fair notice where only possible reason was acquiescence).

[133] The cases Williams cites as support for its argument are distinguishable on several grounds, including their stricter CERCLA context that requires the listing of substances EPA deems hazardous (whereas AS 46.03.822 does not), and their conclusions that notice was lacking only when the court found the statute ambiguous and official agency interpretations or guidance were conflicting. *See Massachusetts v.*

(continued...)

Agencies are free to create and change policies for matters within their purview, as DEC did when it decided to regulate sulfolane and treat Williams as a responsible party. An agency should indicate that it is changing its position and demonstrate good reasons for such a change, but it does not need to "provide detailed justifications for every change" and it is not the court's role to ask whether the chosen policy is better or best — only whether it conforms to reason.[134] Based on the evidence presented at trial, the superior court concluded that DEC reasonably determined sulfolane to be a "hazardous substance" and that unpermitted disposal was a violation of the antipollution provisions of Title 46, Chapter 3. We see no error with that conclusion.

Williams also argues that the superior court's own rulings deprived it of due process because the court promulgated an "eve-of-trial interpretation of 'hazardous substance' " and "imminent and substantial danger" under section .822 and subsection .826(5) that contradicted "both the DEC position on sulfolane during 2001-2003 . . . and the intervening decision of the same court." Williams does not cite case law to support its claim, does not specify exactly how the superior court acted unlawfully, and does not indicate how it was prejudiced. We consider arguments that are given cursory treatment

---

[133] (...continued)
*Blackstone Valley Elec. Co.*, 67 F.3d 981, 988, 993 (1st Cir. 1995) (denying, as violation of fair notice, summary judgment to EPA in enforcement action based on EPA's categorization of ferric ferrocyanide as "cyanide" under CERCLA, because unclear if regulatory background indicated it should be so categorized and because EPA took inconsistent official positions on categorization); *Rollins Env't Servs. (NJ) Inc. v. U.S. E.P.A.*, 937 F.2d 649, 654 (D.C. Cir. 1991) (concluding it would violate requirements of fair notice to impose penalty on company because statute was ambiguous and EPA gave conflicting advice to private parties about how to comply with statute).

[134] *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 250 (2012).

without any support to be waived.[135]  And we do not see how the superior court carrying out its obligation to interpret the relevant statute — issuing rulings on a matter of law that was consistently contested throughout the proceedings — could have worked unfair surprise on Williams or violated its right to fair notice.[136]

### 6. Imposing civil liability for past releases was not an unconstitutional taking.

Williams argues that the superior court's interpretation of AS 46.03.826(5)(A) is an unconstitutional regulatory or judicial taking under the U.S. and Alaska Constitutions.[137]  Williams argues the judgment imposes severe, unforeseeable retroactive liability, which it could not have anticipated because the superior court's interpretation of the relevant statutes was a "change in law."  Because this imposition of liability is linked to an identified property interest and it was accomplished for a public purpose, Williams argues it constitutes a compensable taking.

Williams's argument fails because it continuously characterizes the superior court's interpretation as a "change in the law," when it is not.  Williams merely disagrees with the interpretation and the factual basis for concluding sulfolane is hazardous.

---

[135]  *See Hagen v. Strobel*, 353 P.3d 799, 805 (Alaska 2015).  Furthermore, "eve-of-trial" is a misleading portrayal of the court's actions.  The court informed the parties eleven days before trial and approximately five weeks before the close of trial how it planned to interpret the statute.  Trial courts are under no obligation to issue such memoranda about tentative interpretations of the law ahead of trial, and doing so could only have assisted Williams in preparing its case.

[136]  *See Christopher*, 567 U.S. at 161 (explaining court's role in conducting statutory interpretation when agency adopts interpretation of statute that does not deserve deference).

[137]  "[N]or shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.  "Private property shall not be taken or damaged for public use without just compensation."  Alaska Const. art. I, § 18.

Similarly, Williams mischaracterizes DEC's communications as having previously "expressly advised Williams that sulfolane was not a concern" but now determining it to be a hazardous substance. As discussed above, the superior court made factual findings that DEC never expressly authorized the releases, and these findings are not clearly erroneous.[138] Finally we note that Williams's irresponsible waste management and sulfolane releases are not conduct linked to "reasonable investment-backed expectations" that takings jurisprudence seeks to protect.[139]

## B. Flint Hills's Contractual Indemnification And Statutory Contribution Claims Against Williams

Flint Hills sought indemnification from Williams under the terms of the Purchase Agreement for the remediation and litigation costs associated with the offsite sulfolane.[140] Flint Hills also sought statutory contribution from Williams for those

---

[138] Because there was no "change in law" and no retroactive liability imposed here, we need not reach the arguments of Williams and the State concerning whether retroactive liability under the hazardous substance statute effects an unconstitutional taking.

[139] *State, Dept. of Nat. Res. v. Arctic Slope Reg'l Corp.*, 834 P.2d 134, 139 (Alaska 1991) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984)) (explaining that DNR's use of proprietary information from oil companies did not upset reasonable investment-backed expectations because it did not affect company's actions or investments); *see Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978); *see also Arctic Slope*, 834 P.2d at 140-45 (further finding no unfair surprise given statute authorizing DNR use and concluding regulatory statute was legitimate use of state's police power for public welfare).

[140] We again note that the hazardous substance statute holds ineffective any "indemnification, hold harmless, or similar agreement . . . to transfer liability . . . from the owner or operator of a facility." AS 46.03.822(g). But the statute also allows for indemnification and hold harmless agreements between liable parties to shift financial responsibility. *Id.*

costs.[141]  The superior court determined that the Purchase Agreement terms barred Flint Hills's claim for indemnification because it had contributed to the sulfolane pollution, but that Flint Hills could seek contribution pursuant to AS 46.03.822(j).

Williams disputes the superior court's interpretation of the Purchase Agreement.  It first argues that Flint Hills assumed responsibility for the offsite sulfolane. Williams also contends that the Purchase Agreement's indemnification provision is the sole remedy available to Flint Hills and therefore the superior court erred by allowing statutory contribution.  Williams also argues that any award against it — whether through indemnity or contribution — is subject to the Environmental Cap negotiated in the Purchase Agreement.  Because the superior court did not err when it interpreted the parties' allocation of liabilities and the remedies in the Purchase Agreement, we affirm the court's determinations regarding Flint Hills's claims against Williams.

**1.  Overview of the Purchase Agreement's indemnification and remedies provisions**

Article X[142] of the Purchase Agreement contains detailed provisions regarding financial liability between the parties for litigation or damages incurred following the purchase.  Article X cross-references Section 10.2(a)(iv) of the "Disclosure Schedule" appended to the Purchase Agreement.  That section of the Disclosure Schedule, entitled "Known Environmental Matters," begins with a sentence fragment stating, "Any and all costs of clean-up, monitoring, corrective actions and compliance

---

[141]  AS 46.03.822(j) enables liable parties to "seek contribution from any other person who is liable under (a) of this section."  To resolve a claim for contribution, "the court may allocate damages and costs among liable parties using equitable factors determined to be appropriate by the court."

[142]  The Purchase Agreement refers to articles using Roman numerals but sections within using ordinary Arabic numerals.  Thus it refers to the article as "Article X," but sections within the Article as "Section 10.2," for example.

with regulations incurred after the Effective Time with respect to contamination specifically identified in the referenced figures, tables and text described below." The following sentence adds detail, stating that "Buyer has agreed to assume full responsibility for all existing, known contamination at the Real Property specifically identified in the referenced figures, tables and text described below." The Disclosure Schedule also provides that

> Buyer understands and acknowledges that the levels of Hazardous Materials measured in monitoring wells and contained in the figures, tables, and text below will vary over time, and that Buyer is responsible for such normal variations, as well as any changes in such contamination resulting from Buyer's actions or omissions after the Effective Time. . . . [T]he Buyer further understands that the data is representative of site conditions and can be used to support reasonable conclusions about present contaminant concentrations at the locations sampled and contaminant contours outside those locations.

Listed in the Disclosure Schedule is a table entitled "Sulfolane Data (July 2001 - September 2001) for North Pole Refinery." The table indicates varying concentrations of sulfolane were detected at monitoring wells located on the refinery property, including near the property boundaries.

Section 10.2(a)(iii) of the Purchase Agreement states that "Seller shall indemnify, defend and hold Buyer . . . harmless, from and against any and all Damages incurred by [Buyer] in connection with or arising or resulting from . . . the possession, ownership, use, or operation of the Assets prior to the Effective Time."[143] However, that provision's general language is qualified by various exceptions. Specifically, that subsection provides that

---

[143] "Effective Time" refers to the closing date of asset transfer, March 31, 2004.

7658

Seller shall have no duty to indemnify under this Section 10.2(a)(iii) (A) with respect to Buyer's obligations under Section[] . . . 10.2(b)(v)(C)[144] [matters set forth on the Disclosure Schedule] . . . , (B) to the extent that Damages are caused or contributed to by Buyer's operations, actions or omissions after the Effective Time and/or (C) with respect to any Environmental Claim.

The latter type of claim is "covered exclusively by the provisions of Section 10.2(a)(iv)."

Section 10.2(a)(iv), which governs and serves to define "Environmental Claims," states that Williams will indemnify Flint Hills for damages arising from a broad enumerated list "except to the extent that Damages are caused or contributed to by Buyer's operations, actions or omissions after the Effective Time." The matters listed for which Williams retains responsibility include in relevant part:

(A) any Environmental Condition[145] *existing prior* to the Effective Time, *at, on or under or arising, emanating, or flowing from any of the Assets, or from the property* underlying the Real Property, whether *known or unknown* as of the Effective Time [including damages to third parties "arising therefrom."], . . . *but excluding* (i) any and all costs of cleanup, monitoring, corrective actions and compliance with regulations incurred after the Effective Time with respect to the *matters set forth on Section 10.2(a)(iv) of the Disclosure Schedule.* . . ;

---

144    Section 10.2(b) covers indemnification by the Buyer and states that "Buyer shall indemnify, defend and hold Seller . . . harmless, from and against any and all Damages incurred by [Seller] in connection with or arising . . . from . . . (v)(C) any and all costs of cleanup, monitoring, corrective actions and compliance with regulations incurred after the Effective Time with respect to the matters set forth on . . . the Disclosure Schedule."

145    The Purchase Agreement defines "Environmental Condition" as "any condition existing on, at or originating from, each property included within the Assets which constitutes, (a) a Release on, at or from such property of any Hazardous Materials or (b) a violation of any applicable Environmental Laws or any Environmental Permits."

(B) [damages to third parties] arising out of or related to any Environmental Condition *to the extent (i) not located on the Assets or the property* underlying the Real Property and (ii) existing prior to the Effective Time;

(C) payment of penalties and fines assessed or imposed by any Governmental Authority arising out of or related to any Environmental Condition existing prior to the Effective Time; and

(D) any *Damages that arise*, directly or indirectly, *from the Release*, generation, use, presence, storage, treatment and/or recycling *of any Hazardous Materials* or Petroleum Products by Seller or from the possession, use, ownership, or operation of the Assets *prior to the Effective Time*, or by a third party if any such Hazardous Materials or Petroleum Products were generated or used by Seller . . . *but excluding* (i) any and all costs of cleanup, monitoring, corrective actions or compliance with regulations incurred after the Effective Time with respect to the *matters set forth on Section 10.2(a)(iv) of the Disclosure Schedule*. (Emphasis added.)

In an effort to ensure more certainty regarding the extent of future indemnification obligations, the parties included a damages cap for indemnification, with a specific Environmental Cap of $32 million.[146] And we previously concluded that the Cap applies to all environmental liabilities.[147]

The parties further agreed that remedies provided in the Purchase Agreement would be exclusive, with certain exceptions. Section 10.5 of the Agreement states:

---

[146] Section 10.4(b) provides that "the maximum amount of indemnifiable Damages which may be recovered by [Buyer] from Seller . . . and by [Seller] from Buyer arising out of, resulting from or incident to the matters enumerated in Section 10.2(a) or Section 10.2(b) shall be the Environmental Cap with respect to any and all Environmental Claims."

[147] *Flint Hills I*, 377 P.3d 959, 976 (Alaska 2016).

Except for (a) any equitable relief, including injunctive relief or specific performance to which any Party hereto . . . may be entitled, . . . the indemnification provisions of this Article X shall be the sole and exclusive remedy of each Party . . . with respect to any and all Actions or Damages arising out of this Agreement from and after the Closing.

## 2. The superior court did not erroneously conclude that the Purchase Agreement limited Flint Hills's liability.

The superior court considered both the language of the contract and testimony regarding the circumstances of negotiation and determined that Flint Hills had assumed responsibility only for sulfolane that was known and onsite at the time of purchase. This meant that Williams had a duty to indemnify Flint Hills for offsite sulfolane contamination — though this duty was potentially limited by Flint Hills's own actions, the Environmental Cap, and the remedies provisions of the contract.

The superior court noted that the Purchase Agreement's Disclosure Schedule was entitled "Known Environmental Matters" and referred to "contamination specifically identified" in the Disclosure Schedule. The court also noted that the Disclosure Schedule provided that Flint Hills would be fully responsible for "[a]ny and all costs of . . . corrective actions and compliance with regulations incurred" after the sale for "all existing, known contamination at the Real Property," which was specifically identified in the Disclosure Schedule. The court found that "*at* the Real Property" supported the interpretation that Flint Hills assumed solely onsite contamination. (Emphasis added.) The court added that the studies listed in the Disclosure Schedule "did not identify contamination that was not 'at' the Refinery property — i.e., outside the Real Property's boundaries."

The superior court also analyzed the language in Section 10.2(a)(iv)(A), which referred to liabilities that Williams retained for "any Environmental Condition . . . at, on or under or arising, emanating, or flowing from any of the Assets, or from the

property underlying the Real Property," excluding the conditions on the Disclosure Schedule. The court contrasted this subsection's language with that of 10.2(a)(iv)(B), which referenced Williams's retained liability for harms arising from an Environmental Condition "(i) not located on the Assets or the property underlying the Real Property . . . ." The court concluded that the onsite and offsite specifications meant subsection (A) referred solely to onsite contamination, and by extension, so did the Disclosure Schedule. Therefore, the court concluded that Williams retained liability for sulfolane contamination existing offsite at the time of the asset transfer, even if that contamination was caused by migration of a pollutant that had originated onsite and was disclosed in the Schedule.

Additionally, the superior court relied on trial testimony to clarify the assumption-of-liabilities issue. Representatives of both parties described an "our watch/your watch" approach where each party would retain responsibility for issues caused during their operations, with the very narrow exceptions enumerated in the Disclosure Schedule. Witnesses for both parties agreed that the Disclosure Schedule did not explicitly refer to offsite contamination, and the court concluded that the intent of the parties was that Flint Hills would assume liability for the sulfolane located onsite at the time of purchase.

Williams argues that the court misconstrued the plain language of the Agreement when it concluded that Flint Hills had not assumed liability for offsite sulfolane. First, Williams claims the court incorrectly concluded that the contract distinguished onsite/offsite sulfolane and that Section 10.2(a)(iv)(A) excluded offsite matters. Williams argues that subsection (A) in fact applies to both onsite and offsite conditions, because it refers to conditions "at, on or under or *arising, emanating, or flowing from* any of the Assets *or from* the property." It argues that "arising, emanating, or flowing from" would be superfluous if it related solely to onsite conditions, which

would have been properly encapsulated by "at, on or under." Similarly, Williams points to the broad definition of "Environmental Condition" in the contract — "any condition existing on, at or *originating from*, each property" — to support its contention that a disclosed substance might migrate offsite yet remain part of Flint Hills's assumed responsibilities. Second, Williams argues that the superior court erred by relying on extrinsic evidence to assist with the interpretation of the Purchase Agreement. Williams claims that reference to extrinsic evidence violated Texas contract law governing the agreement.

We conclude that the superior court's inferences about the parties' intent, based on extrinsic evidence, were supported by substantial evidence. We further conclude, from these inferences and from our de novo review of the contract language, that the superior court did not err by determining Williams retained liability for offsite sulfolane.

### 3. The superior court did not err by concluding Williams retained responsibility for offsite sulfolane.

We apply Texas law to the interpretation of the Purchase Agreement; the parties chose Texas law to govern the Agreement and neither party disputes its application here.[148]

---

[148] *See, e.g., Jarvis v. Aetna Cas. & Sur. Co.*, 633 P.2d 1359, 1363 n.5 (Alaska 1981) (declining to disturb parties' choice of law); *see also In re Newport Plaza Assocs., L.P.*, 985 F.2d 640, 644 (1st Cir. 1993) ("When opposing parties agree to the source of the substantive law that controls their rights and obligations, and no jurisdictional concerns are present, a court is at liberty to accept such an agreement without independent inquiry."); *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1076 n.3 (3d Cir. 1988) (permitting parties and lower courts' consent as to choice of law to control when there is no reason to disturb that agreement); *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 421 (D.C. Cir. 1988) (allowing court to assume choice of law was correct since neither party raised the issue).

(continued...)

The language in the Purchase Agreement is ambiguous. On one hand, its definition of Environmental Condition and the language about such conditions in Section 10.2's indemnification provisions appear to be extremely broad; they could therefore apply to both onsite and offsite pollution. The carve-out for sulfolane in the Disclosure Schedule would, by extension, include sulfolane pollution that had migrated offsite prior to the purchase date. On the other hand, the breadth of Section 10.2(a) might apply only to Williams's retained liabilities, while Flint Hills's assumed liabilities are instead narrowly tailored to those "matters set forth" in the Disclosure Schedule only for conditions "at" the property. In that case, Williams's reference to the broad definition of "Environmental Condition" and the language of "arising, emanating, or flowing from" would not apply to Flint Hills's assumed responsibilities. Indeed, the Disclosure Schedule refers to the matters set forth therein as "*contamination*" and not "Environmental Conditions," possibly supporting this narrower construction. (Emphasis added.) In other words, assuming responsibility for "existing, known contamination at the Real Property" would not necessarily include assuming responsibility for the effects arising or emanating from such contamination off the real property.

Because the contract language is ambiguous, it was proper for the superior court to resort to extrinsic evidence. Though Texas law places greater restrictions on the

[148]    (...continued)
We see no obvious reason that applying Texas law to this case would conflict with Alaska's choice of law approach, which follows the Second Restatement of Conflicts. *See Peterson v. Ek*, 93 P.3d 458, 464 n.11 (Alaska 2004). As we discuss below, it is unlikely that the resulting interpretations would differ under either Alaska's or Texas's interpretive approach, as both would admit the extrinsic evidence which informed the superior court's decision. *See Tidler*, 851 F.2d at 421 (permitting analysis of claims under laws of two states).

admission of extrinsic evidence than Alaska law,[149] a court can use extrinsic evidence to resolve patent and latent ambiguities as long as those ambiguities are present in the text.[150]  In other words, Texas law "does not prohibit consideration of surrounding

---

[149]    Under Alaska contract principles, the court's duty is to "ascertain and give effect to the reasonable intentions of the contracting parties." *Flint Hills I*, 377 P.3d at 975 (quoting *Est. of Polushkin ex rel. Polushkin v. Maw*, 170 P.3d 162, 167 (Alaska 2007)).  The court need not initially determine that the disputed language is ambiguous to consider extrinsic evidence; instead, the court can look holistically at the disputed language, other language in the contract, relevant extrinsic evidence, and case law interpreting similar provisions.  *Id.*; *see also Nautilus Marine Enters., Inc. v. Exxon Mobil Corp.*, 305 P.3d 309, 316 (Alaska 2013) ("We have expressly rejected the 'artificial and unduly cumbersome' two-step process used in other jurisdictions in which 'resort to extrinsic evidence can take place only after a preliminary finding of ambiguity.' " (quoting *Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 771 n.1 (Alaska 1982))).  But extrinsic evidence cannot be used to add or contradict contract terms.  *See Froines v. Valdez Fisheries Dev. Ass'n*, 75 P.3d 83, 87 (Alaska 2003).

        Texas law is more restrictive.  It indicates that a court's "primary objective is to ascertain and give effect to the parties' intent *as expressed in the instrument*." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018) (emphasis added).  "Objective manifestations of intent control," and therefore courts should interpret language according to its " 'plain, ordinary, and generally accepted meaning' unless the instrument directs otherwise."  *Id.* at 763-64 (quoting *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)).  However, the Texas Supreme Court has explained that the meaning of words often "turns upon use, adaptation and context." *Id.* at 764 (quoting *Heritage Res., Inc.*, 939 S.W.2d at 121).  This context is not just gleaned from the language and structure of the contract itself, but also from the "circumstances present when the contract was entered." *Id.* (quoting *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)).  Thus, while a court cannot look to extrinsic evidence to add or modify contract terms — i.e., to introduce *solely* subjective intent that has not been manifested objectively in the contract — it can use extrinsic evidence where the contract language is inherently ambiguous.  *Id.*

[150]    *URI, Inc.*, 543 S.W.3d at 764-65.

circumstances that inform, rather than vary from or contradict, the contract text."[151] As we discuss below, we conclude that the superior court adhered to Texas contract law's requirements when it used extrinsic evidence to resolve the ambiguities of Article X.

Flint Hills Resources' Alaska President Allen Lasater testified that, based on his understanding of the parties' intent at the time of contracting, Flint Hills did not assume responsibility for offsite contamination. He stated that there was no offsite sulfolane contamination then "known" and thus it was not included in the Disclosure Schedule. Lasater essentially equated unknown to undisclosed, and therefore liability for those unknowns "remained with Williams." He explained that this was a logical intent because Flint Hills needed to know the extent of pollution in order to agree to continue running the refinery's pollution remediation system consistent with DEC's compliance orders.

Williams representative Randy Newcomer qualified references to known conditions as "known conditions *which were primarily onsite*." (Emphasis added.) He stated that Flint Hills took responsibility for "known cleanup" of "known contaminants" as described in the Disclosure Schedule as of the Effective Date, after which Flint Hills was responsible for additional pollution occurring on- and offsite during their ownership. Williams thus remained responsible for the unknown conditions offsite "caused . . . by Williams during its ownership." Upon further questioning, Newcomer stated that there was a "your watch/my watch kind of . . . thing" specifically for offsite contaminants. He explained that if a known contaminant offsite caused damage before the Effective Date, Williams would take responsibility, but "[i]f it was something that Flint Hills caused during their ownership of the [r]efinery," then Flint Hills assumed responsibility. Newcomer admitted that, as he understood the contract, Williams would be obligated to

---

[151] *Id.* at 767 (quoting *Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011)).

-74-                                                                          **7658**

indemnify Flint Hills for the portion of sulfolane that had migrated off the property when Williams owned the refinery. But he said that further migration or contamination offsite after the Effective Date would be the responsibility of Flint Hills. On cross-examination, Newcomer emphasized that liabilities were defined by their known/unknown status rather than onsite/offsite.

The Williams Companies Senior Vice President Phillip Wright, who was involved in the refinery sale negotiations, similarly testified that "as a general matter, we agreed to a your watch/our watch type principle . . . in which if the cause for a given contamination was generated while we were the owner and operator of the Refinery, we would be liable for those damages . . . and they would retain liability for anything generated on their watch which was during their ownership and operation of the Refinery." But he specifically stated that "those damages" Williams retained responsibility for would *not* "include the cleanup costs associated with migration of known characterized contamination." He testified that it was Williams's intent, expressed through the language of the contract, that if the sulfolane migrated off the property, it was Flint Hills's responsibility. He further added that "[i]t wouldn't have been possible for [Flint Hills] to assume" the sulfolane "would be retained on site . . . because it was [in] the groundwater" and not in a "vessel." He stated that Williams representatives "assumed we were dealing with a sophisticated player that understood these matters and understood groundwater hydrology."

Testimony from representatives of both parties presented competing interpretations of the contract. Ultimately, the determination of the parties' intentions and representations during negotiations are issues of fact properly within the province of the superior court. The court did not clearly err when it concluded as a factual matter that the parties intended for Williams to retain responsibility for its portion of offsite sulfolane, and for Flint Hills to assume liability only for sulfolane contamination onsite

and for any additional pollution it generated after the purchase date which might migrate offsite. Therefore we conclude as a matter of law that the Purchase Agreement language reflects that intent.

### 4. The superior court did not err by concluding that Flint Hills could pursue contribution.

The superior court concluded that contractual indemnification was not available to Flint Hills because it had "caused or contributed" to the offsite sulfolane contamination. And the court concluded that because indemnification was not available, Section 10.4(b)'s Environmental Cap did not apply.[152] But the court determined that Flint Hills could pursue contribution from Williams under AS 46.03.822(j). Exercising its discretion to allocate equitable responsibility among the parties,[153] the court determined that Williams was required to contribute $52.5 million to Flint Hills's offsite response costs, reflecting its equitable allocation of 75% of costs to Williams. The court awarded $51.4 million for offsite sulfolane and $1.17 million for onsite PFAS contamination, plus prejudgment interest on both.

No party disputes the court's determination that Flint Hills was barred from pursuing contractual indemnity. However, Williams contends that the superior court's assessment of damages for offsite sulfolane was erroneous because it exceeded the Environmental Cap of $32 million. Williams claims that the Environmental Cap should apply to all forms of damages, including statutory damages and contribution allocations,

---

[152]    In *Flint Hills I*, we determined that indemnification claims for environmental liabilities would be subject to the Cap. 377 P.3d at 976.

[153]    *See* AS 46.03.822(j) ("[T]he court may allocate damages and costs among liable parties using equitable factors determined to be appropriate by the court."); *cf. Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 122 (D.D.C. 2014) (discussing court's discretion to allocate contribution in CERCLA context), *aff'd*, 833 F.3d 225 (D.C. Cir. 2016).

rather than only to contractual indemnification damages.[154] Williams further argues that statutory contribution is not available to Flint Hills because the Purchase Agreement made indemnification the exclusive remedy for environmental damages claims. Williams argues that by failing to properly construe the exclusive remedies provision in Section 10.5, the superior court "allowed Flint Hills to achieve an end-run around" the indemnity bar. Williams asserts that, because money damages are not equitable relief allowable under the Purchase Agreement and because we characterized contribution damages under AS 46.03.822(j) as a legal claim in *Flint Hills I*, contribution should be barred by the Purchase Agreement. We disagree.

The Purchase Agreement at Section 10.2(a) provides that Williams would indemnify Flint Hills "(iv) except to the extent that Damages are caused or contributed to by [Flint Hills's] operations, actions or omissions after the Effective Time." The most natural reading of this language and the reading best supported by trial testimony is what the superior court first concluded: "reflecting the joint 'my watch/your watch' concept for liabilities, the parties' cross-indemnity provisions included language clarifying their obligations to be limited *to their own* causes and contributions of Environmental Conditions, excluding reimbursement and exempting each from holding the other harmless for contributions or conditions caused by the other's conduct." However, the superior court later determined that because Flint Hills contributed to some of the sulfolane pollution during the period it operated the refinery, as a matter of law "[t]his exception precludes contractual indemnity for sulfolane contamination." Because neither Williams nor Flint Hills challenges the superior court's interpretation, we do not consider

---

[154] Williams also argues that the superior court made two other errors when it interpreted the Cap: the court determined that insurance proceeds paid to Flint Hills were not relevant to the Cap, and it declined to enforce the Cap for public policy reasons. Because we conclude that the Cap does not apply to the contribution claim, we do not address these arguments.

it further.

We agree with the superior court that, because Flint Hills cannot pursue indemnification under the Purchase Agreement, the Environmental Cap does not apply. Section 10.4's "Limitations on Indemnification" states in subsection (b) that "the maximum amount of *indemnifiable* Damages" arising out of Sections 10.2(a) and (b) that can be recovered by "*Indemnified* Parties" is a Cap "with respect to any and all claims *for indemnity*." (Emphasis added.) This language makes clear that the Cap will apply only to indemnification claims. Furthermore, Section 10.5 provides that "the *indemnification* provisions of this Article X shall be the sole and exclusive remedy of each Party," "[*e*]*xcept* for . . . equitable relief." (Emphasis added.) The Agreement makes clear that both parties understood equitable relief is not governed by the terms of limitation in their private contract.[155] It was not error for the court, when making contribution allocations, to take into account the parties' intended contractual allocations without being limited by their express terms — in this case, the Environmental Cap.[156]

---

[155] *Oakly Enters., LLC v. NPI, LLC*, 354 P.3d 1073, 1080 (Alaska 2015) (discussing nature of statutory contribution remedy for recovering environmental remediation costs and explaining "contribution claims essentially seek to allocate damages equitably among those who share responsibility").

[156] *See* AS 46.03.822(j). CERCLA case law supports this approach and because Alaska's hazardous substance statute is informed by CERCLA, case law on that federal statute is persuasive — though not dispositive — for resolving state law claims. *Berg v. Popham*, 113 P.3d 604, 606, 608 (Alaska 2005); *see Lockheed Martin Corp.*, 35 F. Supp. 3d at 123, 143-44 (explaining court has "broad discretion" to make allocation determinations in CERCLA context and "the predominant concern in equity is the intent of the parties"); *Halliburton Energy Servs., Inc. v. NL Indus.*, 648 F. Supp. 2d 840, 877, 880-81 (S.D. Tex. 2009) (explaining that even inapplicable indemnification provisions can be considered to determine intent of parties to allocate contribution responsibility); *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326 (7th Cir. 1994) (considering parties' intent as expressed in their contractual arrangements to determine

(continued...)

Finally, the superior court did not err by concluding that Flint Hills could pursue statutory contribution under AS 46.03.822(j). In *Flint Hills I*, we referred to Flint Hills's indemnification claim *and* its statutory contribution claim under subsection .822(j) as "legal claims," in contrast with its "equitable claims" for declaratory judgment and specific performance.[157] We did not, however, reach the question whether statutory contribution constitutes a legal or equitable *remedy*. Contribution is an equitable remedy.[158] This is so regardless of whether it is provided for by statute.[159] Thus a claim for statutory contribution is not barred by the Purchase Agreement's exclusive remedies provision.

Williams's argument that contribution achieves an "end-run around" the indemnity bar is unpersuasive. The parties agreed they would still be able to pursue

---

[156] (...continued)
equitable contribution allocations); *Beazer E., Inc. v. Mead Corp.* (*Beazer II*), 412 F.3d 429, 447 n.20 (3d Cir. 2005) (explaining that indemnification provisions that do not apply directly are still factor to consider in contribution claim).

[157] 377 P.3d 959, 973-74 (Alaska 2016).

[158] *See McLaughlin v. Lougee*, 137 P.3d 267, 275-79 (Alaska 2006) (recognizing common law contribution need for fairness purposes); *Oakly Enters., LLC*, 354 P.3d at 1080 (explaining contribution claims aim to equitably allocate damages among responsible parties); *Deal v. Kearney*, 851 P.2d 1353, 1355-56 (Alaska 1993) (agreeing that "claims for contribution, indemnity, or subrogation are . . . claims grounded in equity"); *Fellows v. Tlingit-Haida Reg'l Elec. Auth.*, 740 P.2d 428, 432 (Alaska 1987) ("Contribution is an equitable doctrine adopted to remedy the unfairness of the common law rule allowing one of several tortfeasors to bear responsibility for the entire loss.").

[159] *See Benner v. Wichman*, 874 P.2d 949, 956 (Alaska 1994) (implying now-repealed contribution statutes provided for "equitable contribution"); *Arctic Structures, Inc. v. Wedmore*, 605 P.2d 426, 430 (Alaska 1979) (discussing former contribution statute AS 09.16.020(3) that expressly provided "principles of equity applicable to contribution generally shall apply").

equitable relief, "including injunctive relief or specific performance." The word "including" indicates these examples are illustrations rather than an exhaustive list of allowable equitable relief. Contribution falls squarely into relief allowed even under the parties' own contractual arrangement. And Williams misconstrues our previous decision when it argues that contribution provides a duplicative and thus inappropriate remedy once indemnification is unavailable.[160] In *Flint Hills I*, we denied Flint Hills declaratory relief and specific performance because we determined that it still had an adequate legal

---

[160] We do not decide whether contribution would have been available absent the parties explicitly permitting the pursuit of equitable remedies. We have recognized a common law contribution remedy, *McLaughlin*, 137 P.3d at 275-79, and a statutory contribution remedy in the hazardous substance context, AS 46.03.822(j). But Alaska does not have a general contribution statute, such as the proposed Uniform Contribution Among Tortfeasors Act of 1955, that discusses the relation between indemnification and contribution. And even CERCLA case law, though generally indicating that an indemnification agreement encompassing CERCLA liability between responsible parties will control, is not always clear about whether such an agreement displaces contribution altogether or controls equitable allocation in a contribution action. *See, e.g.*, *Fina, Inc. v. ARCO*, 200 F.3d 266, 273-74 (5th Cir. 2000) (allowing claim for contribution only after concluding that parties' indemnification provision did not cover CERCLA claims); *Kerr-McGee Chem. Corp.*, 14 F.3d at 326 (finding indemnity agreement between parties remained applicable in CERCLA action, but that result of indemnification and contribution would have been identical and therefore declining to reverse contribution award; also indicating that equitable allocation informed by indemnification agreement could be modified depending on parties' ability to pay to avoid shifting cleanup costs onto public); *Beazer E., Inc. v. Mead Corp.* (*Beazer I*), 34 F.3d 206, 208-10, 218-19, 219 n.10 (3d Cir. 1994) (reversing dismissal of contribution claim because indemnification claim did not cover CERCLA liability but implying that indemnification provisions, rather than equitable apportionment, would control if applicable); *Beazer II*, 412 F.3d at 447 n.20 (revisiting issues between parties and interpreting *Kerr-McGee* to mean that when "indemnification provision did cover CERCLA liability, . . . no equitable allocation proceeding was required"); *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 16 (2d Cir. 1993) (recognizing that applicable indemnification provisions should be followed though they may incur "seemingly harsh result," but failing to specify whether sole remedy available was indemnification or if contribution could be pursued, though result would be under parties' indemnification provisions).

remedy through indemnification or contribution — even if some of those legal remedies might be time-barred by the statute of limitations.[161] We noted that Flint Hills's equitable claims sought identical relief to its legal claims, since its requests for declaratory judgment and specific performance essentially asked the court to order Williams to pay the same damages Flint Hills had requested in its indemnification and contribution claims.[162] We did not conclude in *Flint Hills I* that indemnification and contribution were duplicative remedies or constituted identical relief.

Unlike its claims for declaratory relief and specific performance vis-à-vis its claims for indemnification and statutory contribution, Flint Hills's contribution claims are not duplicative of its legal indemnification claims. If available, indemnification might have enabled Flint Hills to recover entirely for the offsite sulfolane pollution that Williams caused or contributed to prior to the refinery purchase, without any equitable modifications, but subject to the Environmental Cap.[163] By contrast, statutory contribution requires the superior court to weigh equitable factors which, besides the intent of the parties as evidenced by their contract, also includes the conduct of parties. The parties' indemnification agreement, although inapplicable, served to inform the court about the parties' intent, but it did not bind the court to the same result in its statutory contribution determination as it would reach under its contractual indemnification

---

[161] *Flint Hills I*, 377 P.3d at 974 (dismissing claims for declaratory relief and specific performance of contract that duplicated its financial contribution claims); *see also Knaebel v. Heiner*, 663 P.2d 551, 553 (Alaska 1983) ("One who seeks the interposition of equity must generally show that he either has no remedy at law or that no legal remedy is adequate.").

[162] *Flint Hills I*, 377 P.3d at 974.

[163] "An express indemnity generally is not subject to equitable considerations or a joint legal obligation to the injured party; rather, it is enforced in accordance with the terms of the contracting parties' agreement." 41 AM. JUR. *Indemnity* § 7 (2022).

determination.

For these reasons, the contract language expressly allows the statutory contribution remedy and doing so does not inappropriately provide Flint Hills an "end-run around" its contractual arrangements or inappropriately award an equitable remedy when a legal one was potentially available. The superior court did not err by granting Flint Hills statutory contribution from Williams under AS 46.03.822(j).

### 5. The superior court's contribution allocations were not erroneous.

A party liable for the release of a hazardous substance under AS 46.03.822(j) "may seek contribution from any other person who is liable."[164] During a statutory contribution proceeding, "the court may allocate damages and costs among liable parties using equitable factors determined to be appropriate by the court."[165]

After Flint Hills sought contribution from Williams, the superior court made a series of findings regarding Flint Hills's contribution claims. In relevant part, the court found: "Williams is strictly liable, jointly and severally, under AS 46.03.822 for hazardous substance releases as an owner and operator of the [refinery]"; "the harm caused by Williams['s] sulfolane releases is not divisible or reasonably capable of apportionment" and thus Williams "is jointly liable for the entire amount of response costs." Based on consideration of many equitable factors — including contractual indemnity clauses, proportions of sulfolane releases attributable to each party, the degree of cooperation by each party, and promptness of reporting sulfolane in the groundwater — the court found "Williams is responsible for 75% of the [offsite] sulfolane response costs, while Flint Hills is responsible for 25% of the costs, and the State is not

---

[164]   AS 46.03.822(j).

[165]   *Id.*

-82-                                                                          **7658**

responsible for any of the costs."[166]

Williams appeals the superior court's statutory contribution allocation under AS 46.03.822(j), arguing the court erred by (1) allocating anything for offsite sulfolane to Williams because the parties "had allocated full responsibility for sulfolane to Flint Hills under the Agreement"; (2) failing to properly consider DEC's non-regulation of sulfolane prior to 2004; (3) penalizing Williams for defending itself; (4) "failing to allocate responsibility to the State and ignoring Williams['s] equitable estoppel and laches defenses"; and (5) "failing to allocate responsibility to the City."

### a. The court did not err by allocating statutory contribution for offsite sulfolane to Williams.

We have affirmed the superior court's conclusion that Williams retained responsibility for sulfolane that was offsite at the time of the Purchase Agreement and that Flint Hills could recover through statutory contribution in the absence of contractual indemnification. The court therefore did not err by allocating responsibility to Williams under the contribution provisions of AS 46.03.822(j).[167]

### b. The superior court adequately considered DEC's earlier non-regulation of sulfolane when it allocated damages.

Williams argues that the superior court erred when it "failed to compare the relative 'culpability' of Williams and Flint Hills given the very different regulatory environments in which each operated the refinery." Namely, because sulfolane was not regulated as a hazardous substance when Williams released it, Williams argues the court erred by not reducing Williams's culpability. Williams relies primarily on two cases for

---

[166] The court did not allocate any costs to the City of North Pole, which was not a party at the trial.

[167] *See Oakly Enters., LLC v. NPI, LLC*, 354 P.3d 1073, 1077, 1082-83 (Alaska 2015) (discussing and affirming broad, non-inclusive list of factors superior court considered in allocating responsibility for damages under subsection .822(j)).

support: *Boeing Co. v. Cascade Corp.* for the assertion that "[a] court should consider the care a party exercised 'in light of the practices characteristic of the time' and may reduce a party's share if no rules or laws prohibited the practices at the time";[168] and *Oakly Enterprises, LLC v. NPI, LLC* for the assertion that "[a] court should also consider which party 'knew or should have known' of the contamination and which party 'had the ability to control the [cause]' at the time."[169] Williams argues that, had sulfolane been regulated before the Purchase Agreement, it would have been able to keep it onsite because it "kept all *regulated* contaminants onsite during its tenure."

Superior courts have broad discretion over which equitable factors to consider when allocating costs under both CERCLA and AS 46.03.822.[170] A court *may* choose to reduce a party's damages according to the party's practices and prevailing circumstances at the time, but it is not required to. And as the State points out, neither *Boeing Company* nor *Oakly Enterprises* supports Williams's position in this case. Even though sulfolane was not yet regulated as a hazardous substance, it would have been a pollutant under AS 46.03.900(20) and thus its unpermitted releases were prohibited under AS 46.03.710. As Williams conceded at trial, releasing sulfolane regardless of its official status as a hazardous substance was prohibited by law — a fact that counts against Williams rather than in its favor. The record demonstrates that Williams knew about the sulfolane releases during its tenure at the refinery due to its own negligence, but failed to address the ongoing releases. Williams knew sulfolane was at least toxic if not "hazardous." Yet the "care" that Williams exercised included storing sulfolane-

---

[168] 207 F.3d 1177, 1187 (9th Cir. 2000).

[169] 354 P.3d at 1077.

[170] *E.g.*, *id.* at 1078, 1080-83 (applying clear error standard of review to factual findings and abuse of discretion standard to decisions whether to admit or exclude evidence); *Boeing Co.*, 207 F.3d at 1187.

containing waste in a leaky, decommissioned lagoon, some of whose many holes were crudely "patched" by nailing two-by-fours to the liner. Williams also unilaterally stopped the monitoring that DEC requested to help identify and address the source of the sulfolane leaks. That behavior was neither typical nor allowed at the time, and Williams knew of and was in control of the cause of the contamination, supporting the court's decision to impose statutory contribution against Williams.

### c. The superior court did not penalize Williams for "defending itself."

Williams argues that the court erred because its "allocation expressly took into account Williams'[s] alleged 'recalcitrance' and 'refusal to assist' DEC." Williams argues it was penalized for defending itself. Williams contends it was within its rights to refuse to provide alternative water and to indemnify Flint Hills, and claims it would be unconstitutional to penalize it for doing what the law plainly allows it to do.[171]

The State quickly and correctly dismisses this argument by pointing out that "[a] party may be 'within its rights' to refuse to act until ordered by a court, but its choices can still weigh against it in equity." Courts often consider the extent to which parties cooperate with regulators in this context.[172]

---

[171]     We agree with the State that none of the cases Williams cites for support contradict the assertion that a party's refusal to act can "weigh against it in equity." Williams relies for support on an incomplete quote from a dissent, without identifying it as such, but omits the following paragraph of that dissent, which acknowledges "CERCLA strongly incentivizes voluntary compliance" and refers to a case that recognizes the court's ability to impose fines when a responsible party willfully fails to comply with an EPA order without sufficient cause. *McGinnes Indus. Maint. Corp. v. Phoenix Ins. Co.*, 477 S.W.3d 786, 801 (Tex. 2015) (Boyd, J., dissenting) (citing *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 114 (D.C. Cir. 2010)).

[172]     *See, e.g.*, *Oakly Enters.*, 354 P.3d at 1077 & n.6 (allowing superior court to consider "the degree of cooperation by the parties with Federal, State or local officials

(continued...)

Williams asserts in reply, without support, "that Williams cooperated in the initial investigation" and that "six years after the refinery's sale, Williams was participating and willing to continue doing so, until the State abruptly stopped investigating and sued." Our review of the record confirms that Williams conducted groundwater sampling for sulfolane for about a year before stopping the sampling without having identified the source of the sulfolane leak, contrary to DEC's instructions.[173] And Williams attended meetings with DEC and offered to pay for and conduct certain modeling, though it did not give the models to DEC. But Williams does not point to anything in the record indicating that it cooperated with DEC. Williams has not challenged the superior court's findings of fact on this issue, including its extensive findings showing an overwhelming level of inaction by Williams even after it had received notice in 2010 that DEC would be treating sulfolane as hazardous. The court did not abuse its discretion by allocating costs against Williams in part for its lack of cooperation.

### d. The superior court did not err by not allocating responsibility to the State or by ignoring Williams's equitable defenses.

Williams argues that because the State admitted to being a "liable landowner under AS 46.03.822(a)" as an owner of the refinery lands, the court erred by not allocating some responsibility to the State under AS 46.03.822(j). Williams also argues that "the court should have allocated some .822(j) responsibility to the State" based on laches and equitable estoppel.

---

[172] (...continued) to prevent any harm to the public health or the environment," among other equitable factors, when allocating responsibility for releases under AS 46.03.822(j) (quoting *Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 123 (D.C. Cir. 2014))).

[173] *Flint Hills I*, 377 P.3d 959, 963 (Alaska 2016).

Williams cites *FDIC v. Laidlaw Transit, Inc.*[174] for support that the State should be allocated costs for sulfolane contamination, but that case does not support its argument. In *Laidlaw* we recognized that cleanup costs need not "be borne by all potentially responsible parties equally" and that courts can "distinguish among potentially responsible parties to avoid inequitable results."[175] And AS 46.03.822(j) expressly grants discretion to "allocate damages and costs among liable parties using equitable factors determined to be appropriate by the court." Williams's argument amounts to mere disagreement with how the court weighed these equitable factors.

When it found that the State was without fault as a landowner, the superior court reasoned that "[n]o persuasive evidence was presented at trial to support an equitable allocation" to the State. Williams points to several factors it suggests indicate the State's culpability. For instance, it asserts that the State had a "but-for causal role in allowing the sulfolane to remain in the ground throughout Williams'[s] tenure." Williams seems to argue that, because it notified DEC of the sulfolane release in 2001 and DEC told Williams only to keep tracking sulfolane through sampling because it was not then a regulated contaminant, Williams had no obligation to clean it up. But as early as November 2000 a representative from the Department of Natural Resources[176] met with Williams and DEC to discuss the adequacy of Williams's spill prevention efforts and the preparation of a characterization and corrective action plan. In that meeting, DNR told Williams that it might be in default on its lease because of the spills.

Williams also alleges the State was indirectly responsible for sulfolane

---

[174] 21 P.3d 344 (Alaska 2001), *abrogated on other grounds by Buntin v. Schlumberger Tech. Corp.*, 487 P.3d 595 (Alaska 2021).

[175] *Id.* at 349-50.

[176] DNR was the State agency that managed the lease of the land underlying the refinery.

-87- **7658**

releases by allowing Flint Hills to turn off its pumping system in July 2017, which Williams claims "caus[ed] the sulfolane to migrate offsite." Although the State did allow Flint Hills to turn off the pumping system, sulfolane had already been detected offsite in October 2009. Furthermore, the court expressly considered this factor and found it to be outweighed by Williams's "other negative conduct," such as "mismanagement . . . of its waste fluid treatment and disposal systems" and "cessation of testing for sulfolane sources on the [R]efinery property." Williams does not argue that the court erred when it weighed this fact about Flint Hills turning off the pumps in its equitable allocation decision. We are not persuaded the court erred by not allocating financial responsibility to the State as a landowner under these circumstances.

Williams also argues that the superior court "inexplicably ignored Williams'[s] equitable estoppel defense and reasonable reliance on the State's repeated written affirmations that sulfolane was not regulated and could be left in the ground."[177] Williams alleges that the court "previously found this defense to be relevant to allocating damages under .822(j)." But the court previously explained that equitable defenses would be relevant, if at all, for allocation under subsection .822(j) rather than for establishing liability under subsection .822(a) because that would undermine the strict liability framework of the hazardous substance statute. And in any case the court did not explicitly find that Williams's equitable estoppel defense was relevant for subsection .822(j) allocation. As the State points out, Williams does not provide any arguments undermining the court's discretionary decision not to consider Williams's defense of

---

[177]     "Equitable estoppel requires proof of three basic elements:  (1) 'assertion of a position by conduct or word,' (2) 'reasonable reliance thereon,' and (3) 'resulting prejudice.'  In addition, equitable estoppel 'will be enforced only to the extent that justice so requires.' " *Beecher v. City of Cordova*, 408 P.3d 1208, 1214 (Alaska 2018) (first quoting *Jamison v. Consol. Utils., Inc.*, 576 P.2d 97, 102 (Alaska 1978); and then quoting *Mun. of Anchorage v. Schneider*, 685 P.2d 94, 97 (Alaska 1984)).

equitable estoppel.

Williams also argues that laches "should have comparatively reduced Williams'[s] responsibility because" in earlier proceedings "the superior court found laches barred Flint Hills'[s] claims for equitable remedies against Williams due to its 'unconscionable delay' in addressing sulfolane." Williams then states, somewhat misleadingly, that the "factual findings upon which the court's laches decision was made were affirmed on appeal" and should have preclusive effect. We earlier agreed that Flint Hills "reasonably should have concluded 'long before May 10, 200[8]' that sulfolane had migrated beyond the sampling disclosed in the Agreement."[178] But we explicitly did not reach the issue of Williams's laches defense on Flint Hills's equitable claims because these were not available in light of the legal remedies available by contract and statute.[179] Williams also challenges the court's conclusion that Williams's delayed reporting of discovering sulfolane in the groundwater was more problematic than Flint Hills's nearly two-year delay in drilling monitoring wells. We see no abuse of discretion in allocating more responsibility to the party that waited five years to report its discovery that a relatively novel solvent had leached into the groundwater than to the party that delayed drilling "recommended monitoring wells" for about two years.

### e. The superior court did not err by failing to allocate responsibility to the City of North Pole.

Williams next argues that "[t]he City was a significant source of sulfolane" and the court should have allocated responsibility to the City. The court did not rule on the City's liability and prevented Williams from presenting evidence implicating the City's contribution to the sulfolane plume.

As both Flint Hills and the State point out, once the court deconsolidated

---

[178]  *Flint Hills I*, 377 P.3d at 973 (alteration in original).

[179]  *Id.* at 974.

the cases in June 2019 the City was no longer a party to these proceedings. While the cases were consolidated, Williams raised a contribution claim against the City, but the court dismissed it as untimely. Though in the State's suit the court could have considered the City's culpability as an equitable factor under AS 46.03.822(j), because Williams is "strictly liable, jointly and severally" under AS 46.03.822(a), the superior court did not abuse its discretion by failing to allocate costs to an absent party.[180]

Williams also attempts to appeal the deconsolidation order. The Rules of Appellate Procedure require that an appeal brief contain a "short conclusion stating the precise relief sought"[181] and that the argument section contain "the contentions of the appellant with respect to the issues presented" as well as a "heading indicating the subject matter" for "[e]ach major contention."[182] Williams asks in its statement of issues on appeal whether the superior court erred in deconsolidating the cases but does not request that the deconsolidation be reversed on appeal, and omits any mention of the order from its discussion heading. Williams claims it was prejudiced by deconsolidation, but fails to challenge the court's detailed justifications for deconsolidating the cases. Williams adds in a heading in its reply brief that the superior court "erred by *sua sponte* deconsolidating the cases," but again fails to cite to a rule or case indicating how the court erred. Williams waived its deconsolidation argument: we "consider as abandoned questions set forth in the Points but not argued in . . . [the] brief,"[183] and an appellant's

---

[180]    *See Laidlaw Transit, Inc.*, 21 P.3d at 349-50 (contemplating absentee responsible parties in AS 46.03.822(j) contribution claim and explaining how courts can "distinguish among potentially responsible parties to avoid inequitable results").

[181]    Alaska R. App. P. 212(c)(1)(I).

[182]    Alaska R. App. P. 212(c)(1)(H).

[183]    *Reilly v. Northrop*, 314 P.3d 1206, 1212 n.4 (Alaska 2013) (alteration in
(continued...)

reply "brief may raise no contentions not previously raised in either the appellant's or appellee's briefs."[184]

## VI.    CONCLUSION

For the reasons stated above, we

AFFIRM the superior court's conclusion that sulfolane is a hazardous substance under AS 46.03.822(a);

AFFIRM the superior court's award of response costs under AS 46.03.822 to the State and Flint Hills for Williams's offsite sulfolane releases;

AFFIRM the superior court's award of natural resource damages to the State for the loss of access to groundwater;

AFFIRM the superior court's interpretation of the Purchase Agreement's indemnification provisions;

AFFIRM the superior court's contribution awards under AS 46.03.822(j);

AFFIRM the superior court's decision not to refer onsite PFAS contamination issues to DEC; and

AFFIRM the superior court's declaratory relief; but

REMAND the superior court's injunctive relief for further proceedings in light of this opinion.

---

[183]    (...continued) original) (quoting *Wetzler v. Wetzler*, 570 P.2d 741, 742 n.2 (Alaska 1977)).

[184]    Alaska R. App. P. 212(c)(3).